**UNITED STATES of America**

v.

**John POZSGAI, Gizella Pozsgai, Mercer Wrecking & Recycling Corporation, J. Vinch & Sons, Inc.**

**John Pozsgai and Gizella Pozsgai, Appellants.**

No. 92–1454.

United States Court of Appeals, Third Circuit.

Argued Jan. 8, 1993.

Decided June 25, 1993.

Order Denying Amendment and Rehearing Aug. 10, 1993.

Paul D. Kamenar (Argued), Washington, DC, for appellants.

Vicki L. Plaut (Argued), J. Carol Williams, U.S. Dept. of Justice, Land & Natural Resources Div., Washington, DC, for appellee U.S.

Robert S. Goldsmith, Greenbaum, Rowe, Smith, Ravin & Davis, Woodbridge, NJ, for appellee Mercer Wrecking and Recycling Corp.

David I. Bookspan, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, PA, for appellee J. Vinch & Sons, Inc.

Before: HUTCHINSON and SCIRICA, Circuit Judges and STANDISH, District Judge*

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

In this civil enforcement action, John and Gizella Pozsgai appeal the district court's judgment finding them strictly liable for discharging fill material into wetlands on their property in violation of the Clean Water Act. Defendants also appeal various orders granting the government injunctive relief, finding John Pozsgai in contempt of the injunction, and denying the Pozsgais' motion for relief from judgment. We will affirm.

I.

In April 1987, the U.S. Army Corps of Engineers received information that fill material was being dumped into wetlands on a 14–acre site in Morrisville, Pennsylvania. The Corps investigated the site, determined that nearly the entire property constituted wetlands, and found that concrete rubble, earth, and building scraps had been dumped onto one-half to three-quarters of an acre of the wetlands portion of the property. Corps biologist and field investigator Martin Miller described the site as "a forested wetland dominated by arrowwood" and noted "areas of standing water were scattered throughout the site," and "a stream flows along the east border of the property and wetland and is a tributary to the Pennsylvania Canal." Miller also observed several species of vegetation on

* The Honorable William L. Standish, United States District Judge for the Western District of Pennsylvania, sitting by designation.

the site which require a saturated environment to survive, including skunk cabbage, sensitive fern, red maple, sweet gum, ash, and aspen. Soil borings taken by Miller and other Corps biologists confirmed the initial determination of wetlands, revealing water either at or within one inch of the surface of the soil. This so-called hydric soil takes 100 years or more to develop.

Unpermitted discharge of dredged or fill materials into certain wetlands[1] violates a regulation promulgated under the Clean Water Act, 33 U.S.C. § 1251 et seq. (1988). Miller's field report stated that "[t]he violation consists of the placement of fill (concrete rubble, earth, and building scraps) in three portions of the wetland for the purpose of raising the elevation for construction of a garage." The report identified the violator as John Pozsgai.

At the time of the Corps investigation, John and Gizella Pozsgai were considering purchasing the property to expand their truck repair business. John Pozsgai planned to build a garage on the property, a project which would require filling a significant amount of the area. In preparation for this purchase, Pozsgai hired the engineering firm of J.G. Park Associates to examine the suitability of the property for building. On December 12, 1986, J.G. Park President Nicholas Moran advised Pozsgai by letter of the results of its site investigation of the property. The letter stated:

Based upon this investigation, it is my professional opinion that the entire site meets the criteria set forth by the Army Corps of Engineers as "wetlands." This is based upon soils, hydrology and vegetation.

Please be advised that any further development that might be considered on this site would have to be approved and reviewed by the Army Corps of Engineers, and it has been our experience in the past that the Corps is most reluctant to issue permits for sites that have conditions such as this.

This advice turned out to be accurate. Corps biologist Miller spoke to Pozsgai by telephone and advised him not to place fill in the wetlands until he had obtained a permit. Pozsgai told Miller a previous prospective buyer was responsible for at least some of the filling but that Pozsgai planned to fill enough area to build a garage. Pozsgai also agreed to stop his filling activities until he had complied with the permit requirements and said his engineer would call Miller to discuss these requirements.

Pozsgai continued his efforts to purchase the property. Apparently dissatisfied with J.G. Park's opinion, Pozsgai hired a second engineer, Ezra Golub, to evaluate the property. Golub, too, advised Pozsgai the property was wetlands and the Corps would have to approve any building. Seeking yet a third opinion, Pozsgai hired Majors Engineers, who concurred in the views expressed by the previous two engineers.

After receiving the engineers' reports, Pozsgai renegotiated the sale contract for the property. The original sale contract, for a purchase price of $175,000, made the sale contingent on Pozsgai obtaining building permits for his proposed garage. The revised contract replaced the contingency provision with an "as is" clause and included a $32,000 reduction in the purchase price, from $175,000 to $143,000. Under this revised sale contract, Pozsgai purchased the property on June 19, 1987.

In the meantime, Corps investigator Miller continued to monitor activities at the property. Following his April 1987 visit, Miller had several telephone conversations with Pozsgai. Each time, Miller told Pozsgai to stop his filling activities and explained the permit requirements. Additionally, the Corps issued a cease and desist letter to the Cassalias, the prior owners of the property. The Cassalias responded by letter, stating they had sold the property to Pozsgai but had never given him permission to place fill on the property. Miller returned to the site in August 1987 and observed that fill had been placed on an additional two acres of the property. He

---

1. The regulations only cover wetlands adjacent to tributaries of waters used in interstate commerce and nonadjacent wetlands which may affect interstate commerce. 33 C.F.R. § 328.-3(a)(3), (7) (1992).

reiterated to Pozsgai that he would need a permit to discharge the fill and indicated the Corps would issue a cease and desist order if Pozsgai did not stop filling the wetlands. Pozsgai told Miller that township officials and the police had visited him and shown him the cease and desist letter sent to the Cassalias. He also told Miller he had stopped work on the property.

On September 3, 1987, the Corps sent John and Gizella Pozsgai a cease and desist letter. The letter stated fill was being placed on the Pozsgais' property in federally regulated wetlands without a permit in violation of the Clean Water Act and directed the Pozsgais to stop "conducting, contracting, or permitting any further work of this nature." In response, the Pozsgais' counsel wrote the Corps on September 24, reporting that John Pozsgai had conferred with engineers regarding the cease and desist letter and expressing Pozsgai's opinion that the site did not "naturally" contain wetlands but had only become saturated as a result of construction of an overpass near the property.

Miller visited the site again on October 6 and observed additional fill. On this visit, Miller determined almost the entire property constituted wetlands. He ordered Pozsgai not to do any more filling on the property. Pozsgai said he believed the area was not wetlands because he had excavated the stream on the property. Miller returned to the site in November, again observing new fill since his last visit. Miller reiterated the need for Pozsgai to obtain a permit. On December 17, the Corps sent the Pozsgais a second cease and desist letter, directing them to stop filling, and offering them two options to resolve the violation—removing all fill material and restoring the site to its former condition, or obtaining a Water Quality Certification from the Pennsylvania Department of Environmental Resources.

In May 1988, the Corps again discovered that John Pozsgai was continuing to fill the wetlands. Subsequent investigation revealed Pozsgai had received several hundred truck-loads of fill from at least five different hauling companies. On August 18, 1988, following a complaint from a neighbor about the dumping, the U.S. Environmental Protection Agency installed a video camera in the neighbor's house. The video camera recorded dumping on the property.

On August 24, 1988, the United States filed a civil complaint in federal district court, alleging that John and Gizella Pozsgai, and two of the hauling companies hired by the Pozsgais, had violated the Clean Water Act by filling the wetlands on the Pozsgais' property without a permit.[2] The government sought an order to restore the property to its original state, as well as civil penalties. It simultaneously moved for a temporary restraining order and a preliminary injunction to stop further discharge. The district court entered the TRO. Two days later, on August 26, the video camera recorded 25 truckloads of dirt dumped on the site, and a man, identified by witnesses as John Pozsgai, operating a bulldozer leveling the fill.

On September 2, the government obtained an Order to Show Cause why Pozsgai should not be held in contempt for violating the TRO. The district court held a hearing on the contempt proceeding and the preliminary injunction on September 9 and September 16. After the hearing, the court granted the preliminary injunction and held Pozsgai in contempt, ordering him to pay $5,000 within 48 hours.

In the meantime, the government initiated a parallel federal criminal proceeding against John Pozsgai. On December 30, 1988, a jury convicted Pozsgai of 40 counts of unpermitted discharge. The district judge sentenced him to three years for the pre-Sentencing Guideline counts and twenty-seven months for post-Guideline counts, to run concurrently, placed him on 5 years probation, and fined him $200,000. We affirmed the conviction. *United States v. Pozsgai*, 897 F.2d 524 (3d Cir.), *cert. denied*, 498 U.S. 812, 111 S.Ct. 48, 112 L.Ed.2d 24 (1990).[3]

---

2. The district court had jurisdiction under the civil enforcement provision of the Clean Water Act, 33 U.S.C. § 1319(b) (1988).

3. No criminal action was brought against Gizella Pozsgai.

On January 8, 1990, the district court granted a permanent injunction in the government's civil action. The court found the property contained wetlands subject to the Corps' jurisdiction and held the Pozsgais and the haulers strictly liable for the unpermitted discharge. It further ordered defendants to implement the plan developed by the Corps to restore the property. The Pozsgais filed a motion to reconsider which the district court denied.

On June 18, the court implemented its restoration order and directed the defendant haulers to restore the property by removing fill from the wetland areas and depositing it in other non-wetland areas of the property.[4] The Pozsgais filed a Fed.R.Civ.P. 60(b) motion for relief from this order, objecting to the locations where the haulers placed the fill and requesting the court to order the haulers to remove the fill from the Pozsgais' property altogether. The court denied the motion, ruling that the Pozsgais had no "veto power" over the restoration process and that it would be inequitable to require the haulers to move the fill a second time when the Pozsgais had improperly disposed of it in the first place. The court entered final judgment on April 1, 1992. The Pozsgais appealed.[5]

## II.

In furtherance of its purpose to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a), the Clean Water Act prohibits the discharge of pollutants into navigable waters without a permit. 33 U.S.C. § 1311; *United States v. Riverside Bayview Homes,* 474 U.S. 121, 123, 106 S.Ct. 455, 457, 88 L.Ed.2d 419 (1985). The Act defines the operative terms of this prohibition broadly. The term "pollutants" includes fill material such as "dredged spoil, ... rock, sand, [and]

cellar dirt," 33 U.S.C. § 1362(6), and "navigable waters" means "the waters of the United States," *id.* § 1362(7). In so defining the term "navigable waters," Congress expressed a clear intent "to repudiate limits that had been placed on federal regulations by earlier water pollution control statutes and to exercise its powers under the Commerce Clause to regulate at least some waters that would not be deemed 'navigable' under the classical understanding of that term." *Riverside Bayview Homes,* 474 U.S. at 133, 106 S.Ct. at 462 (citing S. Conf. Rep. No. 92–1236, p. 144 (1972); 118 Cong. Rec. 33756–57 (1972) (statement of Rep. Dingell)).

The Corps of Engineers has by regulation interpreted the term "waters of the United States" to include "wetlands," defined as "areas that are inundated or saturated by surface or ground water at a frequency or duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions, [and] generally include[s] swamps, marshes, bogs, and similar areas." 33 C.F.R. § 328.3(b) (1992). The regulation extends the Corps' authority to wetlands "adjacent" to tributaries of waters presently or formerly used, or susceptible to use, in interstate commerce. *Id.* The Supreme Court has upheld this regulation as a reasonable interpretation of the Clean Water Act. *Riverside Bayview Homes,* 474 U.S. at 135, 106 S.Ct. at 463.

Section 404 of the Act authorizes the Corps of Engineers to issue permits for "the discharge of dredged or fill material into the navigable waters...." 33 U.S.C. § 1344(a). The permit program is the central enforcement tool of the Clean Water Act. The program reflects the Act's strategic shift in water pollution policy, which previously had employed only water quality standards.

---

**4.** The haulers, having completed their work, are not parties to this appeal.

**5.** We have jurisdiction under 28 U.S.C. § 1291 (1988). We exercise plenary review over the district court's interpretation of the Clean Water Act and its regulations, which are questions of federal law. *United States v. Gordon,* 961 F.2d 426, 429 (3d Cir.1992). We review the court's factual findings under a clearly erroneous stan-

dard. Fed.R.Civ.P. 52(a); *Sheet Metal Workers Int'l Ass'n Local 19 v. 2300 Group, Inc.,* 949 F.2d 1274, 1278 (3d Cir.1991). We review the court's grant of injunctive relief, its contempt order, and its denial of the Pozsgais' motion for relief from the judgment for abuse of discretion. *Delaware Valley Citizens' Council v. Pennsylvania,* 755 F.2d 38, 41 (3d Cir.), *cert. denied,* 474 U.S. 819, 106 S.Ct. 67, 88 L.Ed.2d 54 (1985).

These standards proved unsuccessful in controlling pollution because the Corps had difficulty linking the quality of the water to discharges from a particular source. The Act sought to avoid this problem by focusing pollution control efforts at the point of discharge. *See EPA v. California ex rel. State Water Resources Control Board,* 426 U.S. 200, 204, 96 S.Ct. 2022, 2024, 48 L.Ed.2d 578 (1976). The Environmental Protection Agency implemented that strategy in part by establishing national effluent standards. The permit system translates these standards into site-specific limitations to accommodate individual circumstances and ease enforcement. *Id.* at 205, 96 S.Ct. at 2025. Unpermitted discharge is the archetypal Clean Water Act violation, and subjects the discharger to strict liability. 33 U.S.C. § 1311(a) ("except as in compliance with [a permit], the discharge of any pollutant by any person shall be unlawful").

### III.

On appeal, the Pozsgais do not dispute they discharged fill onto wetlands without a permit. They urge instead that this conduct did not violate the Clean Water Act. The Pozsgais contend that filling wetlands does not constitute discharge of pollutants "into water" within the meaning of the Clean Water Act, that their wetlands fall outside the Corps' regulation and permit requirements, and that the regulation as applied to them violates the Commerce Clause.

### A.

We first address the Pozsgais' argument that they did not discharge pollutants "into water" within the meaning of the Clean Water Act. 33 U.S.C. § 1362(6). They contend that the fill materials deposited on their property were not "pollutants," and that they discharged only into "wetlands," which are not equivalent to "water."

To assess these contentions, we look to the statute. The operative section of the Clean Water Act is § 301, which provides that absent a permit, "the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a). The Act defines "pollutant" to mean "dredged spoil, rock, sand" and other

materials "discharged into water," *id.* § 1362(6), and defines "discharge of a pollutant" to mean "any addition of any pollutant to navigable waters from any point source," *id.* § 1362(12). The Act defines "navigable waters" to mean "the waters of the United States." *Id.* § 1362(7). The Corps' regulation upheld in *Riverside Bayview* defines "waters of the United States" to include certain wetlands.

#### (1)

In ruling the Pozsgais' fill material constituted "pollutants," the district court cited evidence that they placed "concrete rubble" and "cinder block" on their property and cleared and redeposited vegetation there. The court held each of these qualified as "pollutants," defined to include "dredged spoil, solid waste, ... rock, sand, ... municipal, and agricultural waste...." 33 U.S.C. § 1362(6). On appeal, the Pozsgais stress the absence of the words "fill material" in the definition of "pollutant." They point to Congress' use of the term "fill material" in the Act's permitting provision, *id.* § 1344, as evidence Congress was aware of this phrase and chose not to include it in the definition of "pollutant." This argument is unconvincing. Because the term "pollutant" includes "dredged spoil, rock, [and] sand," *id.* § 1362(6), which are the constituents of the fill material used here, the materials discharged by the Pozsgais constituted "pollutants."

#### (2)

The Pozsgais' second contention is more sweeping. They argue that the phrase "into water" in the definition of "pollutant" forecloses application of the Clean Water Act to their activities, which consisted only of depositing fill material into "wetlands." Again, the district court disagreed, citing the Corps regulation that defines "waters of the United States" to include "wetlands" adjacent to waters used in interstate commerce, 33 C.F.R. § 328.3(a)(7), and to the Supreme Court's *Riverside Bayview Homes* decision upholding this regulation as a reasonable interpre-

tation of the Act, 474 U.S. at 135, 106 S.Ct. at 463.

The Pozsgais contend the district court misconstrued the Act. In their view, the phrase "into water" in the definition of "pollutant" is the critical limiting feature of the Act because this phrase determines application of the Act's permit requirement. They base this argument on the Act's liability section, which provides that without a permit, "the discharge of any *pollutant* by any person shall be unlawful." 33 U.S.C. § 1311(a). By contrast, they contend, the phrase "waters of the United States"—and the Corps' regulation interpreting that phrase to include adjacent wetlands—only define the Act's geographic jurisdiction and cannot alone support a finding of liability. Thus, the Pozsgais maintain, the district court's reliance on these provisions, and on *Riverside Bayview*'s interpretation of them, was misplaced. They conclude that because neither *Riverside Bayview* nor the Corps regulation address the definition of "pollutant," these authorities do not obviate the statutory obstacle to liability created by the requirement that materials only constitute "pollutants" if they are discharged "into water."

The interpretive problem raised by the Pozsgais' argument lies in knitting together the various statutory provisions. Incorporating the definition of "pollutant" in § 1362(6) into the definition of "discharge of a pollutant" in § 1362(12) creates an apparent redundancy, as the term "discharge of a pollutant" then reads: "any addition of any 'dredged spoil ... discharged into water' to navigable waters from any point source." The question then becomes how the phrase "into water" and the phrase "to navigable waters" co-exist in this definition. The Pozsgais avoid this problem by ignoring the

definition of "discharge of a pollutant," and focusing instead exclusively on the definition of "pollutant" and the use of the word "pollutant" in the Act's liability section, § 1311. This reading is untenable because although § 1311 contains the word "pollutant," it does so in the context of expressly prohibiting "discharge of any pollutant." We read this as a clear cross-reference to the definition of "discharge of a pollutant" in § 1362(12).

At oral argument, the Pozsgais argued §§ 1362(6) and (12) are not in conflict. They asserted that because the term "discharge of a pollutant" itself includes the term "pollutant," the former definition, including its use of "navigable waters," is necessarily limited by the phrase "into water" in the definition of "pollutant." The more natural reading of the definition of "discharge of a pollutant" is that the phrase "navigable waters" modifies the phrase "into water," and accordingly, that the critical definition is that given the term "navigable waters." As a textual matter, the word "navigable" is an adjective modifying the word "water." Moreover, the statute contains numerous references to the phrase "navigable waters," revealing that this phrase, rather than "into water," is the focus of the Act's coverage. The Act's "Congressional declaration of goals and policy" states: "it is the national goal that the discharge of pollutants into the *navigable waters* be eliminated by 1985." 33 U.S.C. § 1251(a)(1). Section 404 provides that "[t]he Secretary [of the Army] may issue permits ... for the discharge of dredged or fill material into the *navigable waters* at specified disposal sites." *Id.* § 1344(a). Additionally, the Act defines "navigable waters" to mean "waters of the United States." *Id.* § 1362(7).[6]

The legislative history also demonstrates the significance and breadth of the term

---

**6.** The Pozsgais further contend that subsection (12) seeks to limit subsection (6) by adding the requirement that the discharge be from a "point source." Assuming this is correct, it does not help them. The Act defines "point source" to include "any discernible, confined and discrete conveyance, including but not limited to any ... container, rolling stock, concentrated animal feeding operation, or vessel ... from which pollutants are or may be discharged...." *Id.* § 1362(14). Courts have consistently held that dump trucks and bulldozers, such as those used

for depositing and spreading fill on the Pozsgais' property, qualify as "point sources." *Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 922 (5th Cir.1983); *Matter of Alameda County Assessor's Parcel,* 672 F.Supp. 1278, 1284–85 (N.D.Cal.1987); *United States v. Tull,* 615 F.Supp. 610, 622 (E.D.Va.1983), *aff'd,* 769 F.2d 182 (4th Cir.1985), *rev'd on other grounds,* 481 U.S. 412, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987); *United States v. Weisman,* 489 F.Supp. 1331, 1337 (M.D.Fla.1980).

"navigable waters." The Conference Report states: "[t]he conferees fully intend that the term 'navigable waters' be given the broadest possible constitutional interpretation. . . ." S.Conf.Rep. No. 1236, 92d Cong., 2d Sess. 144, U.S. Code Cong. & Admin. News 1972, 3668, *reprinted in 1 A Legislative History of the Water Pollution Control Act Amendments of 1972* 327 (1973); *see also* H.R.Rep. No. 911, 92d Cong., 2d Sess. 131 (containing identical language), *in 1 Legislative History* 818.

Moreover, the Senate Report makes clear it is the discharge of materials constituting "pollutants" into "navigable waters" that triggers the Act's permit requirement. The Report provides:

> For the first time the Committee would add to the law a definition of the term pollutant. In order to trigger the control requirements over addition of materials to the navigable water, waters of the contiguous zone and the ocean, it is necessary to define such materials so that litigable issues are avoided over the question of whether the addition of a particular material is subject to the control requirements. . . . The control strategy of the Act extends to navigable waters. . . .

S.Rep. No. 414, 92d Cong., 1st Sess. 77–78, U.S. Code Cong. & Admin. News 3668, *in 2 Legislative History* 1494–95. This legislative history supports our view that the phrase "navigable waters" rather than "into water" is the critical statutory language. It also demonstrates the definition of "pollutant" establishes the types of materials whose discharge violates the Act rather than the locus of their discharge, further undermining the significance of the "into water" phrase.

Our emphasis on "navigable waters" also comports with the interpretation of the Clean Water Act by other courts, who have reached the same conclusion without expressly considering the "into water" portion of the definition of "pollutant." In upholding the Corps' wetlands regulation in *Riverside Bayview*, the Supreme Court stated simply: "the act prohibits discharges into 'navigable waters,' see Clean Water Act §§ 301(a), 404(a), 502(12), 33 U.S.C. §§ 1311(a), 1344(a), 1362(12)." 474 U.S. at 133, 106 S.Ct. at 462. We find significant both the Court's summary treatment of this question and its citation only to the "discharge of a pollutant" definition, § 1362(12), not to the "pollutant" definition, § 1362(6).[7]

The Pozsgais maintain the phrase "navigable waters," which they note is defined as "waters of the United States," refers only to the geographic jurisdiction of the Act. Therefore, they contend, that definition does not modify the phrase "into water," which they read only to describe the conduct regulated by the Act. This distinction is illusory. The purpose of extending the Corps' geographic jurisdiction to "waters of the United States," including adjacent wetlands, is precisely so the Corps can control conduct occurring on these wetlands, i.e., the discharge of pollutants. Indeed, such conduct has given rise to this action.

For the reasons we have outlined, we believe Congress intended "navigable waters" to be the controlling phrase in defining the scope of the Clean Water Act, and we believe this phrase modifies the more general term "into water" appearing in the definition of "pollutant." Accordingly, the Pozsgais' wetlands filling activities constituted "discharge into water" and fall within the statute. Our conclusion that the Act's permit requirement applies to pollutants discharged into "navigable waters" does not, however, dispose of the Pozsgais' second statutory argument—that the Corps' wetlands regulation represents an impermissible construction of the unambiguous statutory term "water."

---

7. Other courts considering wetlands filling cases have similarly interpreted the Act to prohibit discharge of pollutants into navigable waters, thus ignoring the "into water" component of the "pollutant" definition. *See Town of Norfolk v. U.S. Army Corps of Engineers,* 968 F.2d 1438, 1445 (1st Cir.1992); *Avoyelles Sportsmen's League,* 715 F.2d at 922; *United States v. Tull,* 769 F.2d at 183; *United States v. Larkins,* 657 F.Supp. 76, 78 n. 2 (W.D.Ky.1987), *aff'd,* 852 F.2d 189 (6th Cir.1988), *cert. denied,* 489 U.S. 1016, 109 S.Ct. 1131, 103 L.Ed.2d 193 (1989); *United States v. Lambert,* 589 F.Supp. 366, 371 (M.D.Fla.1984); *United States v. Bradshaw,* 541 F.Supp. 880, 883 (D.Md.1981) (all ruling that discharge of fill material into wetlands violates the Clean Water Act).

## B.

In asserting the term "water" as used in the Clean Water Act is unambiguous, the Pozsgais seek to bring this case within the exception to the rule of deference to an agency's statutory interpretation established by *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under *Chevron,* courts should not defer to an agency regulation where legislative language is unambiguous because Congress has chosen to define precisely the statutory meaning and has left no implicit or explicit gap in statutory coverage for the agency to fill. 467 U.S. at 843–44, 104 S.Ct. at 2781–82. Where, on the other hand, a statute is "silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's [regulation addressing the issue] is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2781. Thus, *Chevron* commands a two-step approach. The court first determines whether the statute is clear, and if it is unclear, the court decides whether the agency's construction is reasonable. *N.L.R.B. v. New Jersey Bell Telephone Co.,* 936 F.2d 144, 147 (3d Cir.1991).

Applying *Chevron* in *Riverside Bayview,* the Supreme Court squarely rejected the contention that "water" cannot mean "wetlands." Like the Pozsgais, the defendant in *Riverside Bayview* sought to place fill materials on its property without a Clean Water Act permit in preparation for a construction project, and the Corps of Engineers obtained an injunction against the filling. The defendant contended the Corps' regulation extending the permit requirement to adjacent wetlands exceeded the bounds of the Clean Water Act. Rejecting this contention, the Court determined not only that the phrase "water" lacked a fixed meaning, 474 U.S. at 132, 106 S.Ct. at 462, but also that the Corps "acted reasonably in interpreting the Act to require permits for the discharge of fill material into wetlands adjacent to the 'waters of the United States,'" *id.* at 139, 106 S.Ct. at 465.

In urging Congress' use of the term "water" forecloses application of the Act to their activities, the Pozsgais insist the word "water" means "the liquid state of H$_2$O," not "wetlands" or "moist soil" or "dry land that the Corps determines to be water." In *Riverside Bayview,* the Supreme Court took a different view, stating:

> On a purely linguistic level, it may appear unreasonable to classify "lands," wet or otherwise, as "waters." Such a simplistic response, however, does justice neither to the problem faced by the Corps in defining the scope of its authority under § 404(a) nor to the realities of the problem of water pollution that the Clean Water Act was intended to combat. In determining the limits of its power to regulate discharges under the Act, the Corps must necessarily choose some point at which water ends and land begins. Our common experience tells us that this is often no easy task: the transition from water to solid ground is not necessarily or even typically an abrupt one. Rather, between open waters and dry land may lie shallows, marshes, mudflats, swamps, bogs—in short, a huge array of areas that are not wholly aquatic but nevertheless fall far short of being dry land. Where on this continuum to find the limit of "waters" is far from obvious.

474 U.S. at 132, 106 S.Ct. at 462.

Having determined the term "water" was ambiguous, the Court then moved to *Chevron*'s second step and considered whether the Corps' interpretation of the term to include adjacent wetlands was reasonable. The Court noted that, in determining "the landward limit of Federal jurisdiction under Section 404 [of the Clean Water Act] must include any adjacent wetlands that form the border of or are in reasonable proximity to other waters of the United States," the Corps concluded that "water moves in hydrologic cycles, and the pollution of [adjacent wetlands] ... will affect the water quality of the other waters within that aquatic system." *Riverside Bayview,* 474 U.S. at 134, 106 S.Ct. at 463 (quoting 42 Fed.Reg. 37128 (1977)). Upholding this interpretation, the Court recognized "the evident breadth of congressional concern for protection of water quality and aquatic ecosystems" embodied in the Act, 474 U.S. at 133, 106 S.Ct. at 462, and determined: "[w]e cannot say that the Corps' conclusion

that adjacent wetlands are inseparably bound up with the 'waters' of the United States—based as it is on the ·Corps' and · EPA's technical expertise—is unreasonable," *id.* at 134, 106 S.Ct. at 463.

The Pozsgais attempt to distinguish *Riverside Bayview* on the ground that the Court based its ruling on the "navigable waters" definition rather than the "into water" phrase. But as we have shown, "navigable waters" is the operative phrase. Moreover, as the quoted passage indicates, the ·Supreme Court's analysis dealt with a question common to both statutory phrases—whether the Corps reasonably interpreted the term "water" to include adjacent wetlands.

The rationales underlying *Chevron* apply with particular force to the Corps' application of the Clean Water Act to wetlands. In *Chevron*, the Court defended deference to agency interpretations on the grounds that unlike a court, an agency has specialized knowledge of the relevant statutory area and is a politically accountable body. 467 U.S. at 865, 104 S.Ct. at 2792 ("[j]udges are not experts in the field, and are not part of either political branch of the Government"); *see* Cass R. Sunstein, *Law and Administration after Chevron,* 90 Colum.L.Rev. 2071, 2086–87 (1990).

The *Chevron* Court indicated these rationales are particularly powerful where "the regulatory scheme is technical and complex." 467 U.S. at 865, 104 S.Ct. at 2792. Like the Clean Air Act in *Chevron*, the Clean Water Act addresses a scientifically complicated subject, and has an intricate regulatory structure. Thus, the Supreme Court recognized in *Riverside Bayview:*

> In view of the breadth of federal regulatory authority contemplated by the Act itself and the inherent difficulties of defining precise bounds to regulable waters, the Corps' ecological judgment about the relationship between waters and their adjacent wetlands provides an adequate basis for a legal judgment that adjacent wetlands may be defined as waters under the Act.

474 U.S. at 134, 106 S.Ct. at 463; *see also Arkansas v. Oklahoma,* —— U.S. ——, ——, 112 S.Ct. 1046, 1061, 117 L.Ed.2d 239 (1992) (reversing Court of Appeals decision to inval-idate Clean Water Act permit issued by EPA because that court failed to defer to EPA's interpretation of its water quality regulation and therefore "made a policy choice that it was not authorized to make"); *Chemical Manufacturers Ass'n v. Natural Resources Defense Council,* 470 U.S. 116, 125, 105 S.Ct. 1102, 1107, 84 L.Ed.2d 90 (1985) (deferring to EPA interpretation of Clean Water Act because "EPA's understanding of this very 'complex statute' is a sufficiently rational one to preclude a court from substituting its judgment for that of EPA," and citing *Chevron* ).

The *Chevron* Court's concern that agencies have political. accountability, which courts lack, also supports deference to the Corps' wetlands regulation. In articulating this rationale, the Court reasoned:

> [t]he arguments over policy that are advanced in the parties' briefs create the impression that respondents are now waging in a judicial forum a specific policy battle which they ultimately lost in the agency and in the 32 jurisdictions opting for the "bubble concept," but one which was never waged in the Congress. Such policy arguments are more properly addressed to legislators or administrators, not to judges.... In such a case, federal judges—who have no constituency—have a duty to respect legitimate policy choices made by those who do.

467 U.S. at 864–66, 104 S.Ct. at 2792–93.

The regulation the Pozsgais challenge here represents the product of a nearly twenty-year policy battle over the scope of federal wetlands protection. The Corps initially interpreted the term "navigable waters" to apply only to those waters "subject to the ebb and flow of the tide," the regulatory definition used by the Corps under the River and Harbor Act of 1899. The Environmental Protection Agency, which shared administrative authority under the Clean Water Act with the Corps, believed the Act should be construed to cover wetlands because of their significance to water pollution control. This fight culminated in a 1975 court decision ordering the Corps to revise and broaden its regulation. *Natural Resources Defense*

*Council v. Callaway,* 392 F.Supp. 685 (D.D.C.1975). Following this decision, the Corps revised its regulation, a process which lasted two years, engendered more than 4,500 comments, and resulted in a final rule defining the term "navigable waters" to include wetlands. 42 Fed.Reg. 37122 (1977).

Nonetheless, during the debate on the Clean Water Act of 1977, "because of the pressure of many farm, forestry and land development groups, there were continued efforts to amend the Act to redefine the term "navigable waters" in a more traditional and restrictive sense.... None passed." *Avoyelles Sportsmen's League, Inc. v. Alexander,* 511 F.Supp. 278, 288 (W.D.La.1981), *aff'd,* 715 F.2d 897 (5th Cir.1983). Thus, the *Avoyelles* court concluded, "[w]etlands is a jurisdictional term, the product of the legislative process, of political pressure groups." 511 F.Supp. at 288; *see also Riverside Bayview,* 474 U.S. at 138, 106 S.Ct. at 465 (citing Congress' refusal to limit the definition of "navigable waters" in the 1977 Act as "additional support for a conclusion that Congress in 1977 acquiesced in the Corps' definition of waters as including adjacent wetlands").

The Pozsgais acknowledge the Corps' wetlands jurisdiction continues to be the subject of heated political debate. They note "numerous Congressional hearings have been held," and 52 bills introduced in Congress, to address the regulation of wetlands. Indeed, the dispute over the scope of federal wetlands regulation has been at least as dominant a feature of the political landscape as the debate over the "bubble concept" at issue in *Chevron.* And like the plaintiffs opposed to EPA's "bubble" regulation in *Chevron,* the Pozsgais seek here to "wag[e] in a judicial forum a specific policy battle which [was] ultimately lost in the agency." 467 U.S. at 864, 104 S.Ct. at 2792. But as the Supreme Court stated last term, "[i]t is not our role ... to decide which policy choice is the better one, for it is clear that Congress has entrusted such decisions" to the Corps of Engineers. *Arkansas v. Oklahoma,* — U.S. at —, 112 S.Ct. at 1061. Therefore, we hold that the Clean Water Act's use of the word "water," both as part of the "into water" phrase in the definition of "pollutant"

and in the phrase "navigable waters," pose no statutory obstacle to the Corps regulation under which the district court found the Pozsgais liable.

## IV.

The Pozsgais also contend the wetlands on their property fell outside the scope of the Corps regulation prohibiting unpermitted discharge on adjacent wetlands. In disputing application of the regulation to their activities, the Pozsgais make two arguments, one based on the evidence, the other based on the terms of the regulation. In the evidentiary argument, the Pozsgais maintain the government failed to prove their wetlands are "adjacent" within the meaning of the regulation.

## A.

The regulation grants the Corps jurisdiction over "waters of the United States," defined in 33 C.F.R. § 328.3(a) to include: "[a]ll waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce," § 328.3(a)(1); "tributaries of [these] waters," § 328.3(a)(5); and "wetlands adjacent to [these] waters [or their tributaries]," § 328.-3(a)(7). Applying this regulation, the district court found the Pozsgais discharged into wetlands (§ (a)(7)), which were "adjacent" to a stream on the Pozsgais' property which was a "tributary of the Pennsylvania Canal" (§ (a)(5)). The Canal, in turn, flowed into the Delaware River, which, the court ruled, satisfied the requirement that the Pennsylvania Canal is, was, or could be used in interstate commerce (§ (a)(1)). We review these factual findings under the clearly erroneous standard. *Sheet Metal Workers Int'l Assn. Local 19 v. 2300 Group, Inc.,* 949 F.2d at 1278.

The Pozsgais dispute the stream is a tributary of the Pennsylvania Canal. In making this finding, the district court relied on aerial photographs and testimony from Corps biologist Miller. The government has since conceded the photographs are inaccurate. But the government also introduced other evidence which the Pozsgais have not contested. The eyewitness accounts of two Corps biolo-

gists, Martin Miller and Michael Claffey, recorded in Miller's report of his investigation of the property in April 1987, and in Claffey's affidavit, confirm the stream is a tributary of the Pennsylvania Canal. Given this uncontradicted evidence, we believe the district court's finding was not clearly erroneous.

The Pozsgais also dispute that the Pennsylvania Canal is, was, or could be used in interstate commerce. The district court reached this conclusion by noting the Canal flowed into the Delaware River, which it believed was enough to satisfy the broad reach of the Clean Water Act. The Pozsgais argue that this fact, without more, does not establish the Canal itself was, is, or could be used in interstate commerce. Even if true, this argument is unavailing, because the government has pointed to other evidence supporting the conclusion the Canal in the past was used in interstate commerce, which satisfies the terms of § 328.3(a)(1).

The government requests that we take judicial notice of the Canal's historic significance as an interstate commerce route. It cites Robert McCullough & Walter Leuba, *The Pennsylvania Main Line Canal* (1960), and C.P. Yoder, *Delaware Canal Journal* (1972), two history books which discuss the Canal's nearly 100–year history as a shipping route for coal and other commodities.

Under Fed.R.Evid. 201, we may take judicial notice of any fact "not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." Fed.R.Evid. 201(b). Furthermore, because "judicial notice may be taken at any stage of the proceeding," Fed.R.Evid. 201(f), we may take judicial notice of a fact although the district court did not.

The Pozsgais dispute neither that an appellate court may take judicial notice nor that the history books cited by the government are suitable sources for judicial notice. Instead, they contend only that the books do not prove that the Pennsylvania Canal was ever used in interstate commerce. We disagree.

A cursory review of *The Pennsylvania Main Line Canal* and *Delaware Canal Jour-*

*nal* reveals the Canal's important role as a shipping route carrying coal in interstate commerce. In the middle of the century, the Canal consistently carried more than half a million tons · of coal per year, reaching its peak volume · with 792,000 tons of coal in 1866. Many of the coal barges served the Philadelphia market. Others continued on to New York City, after being towed by steam boats across the Delaware River to Bordentown, New Jersey, where they reached the Delaware and Raritan Canal. In 1939, the Delaware Division Canal Company donated the entire canal property to the Commonwealth of Pennsylvania, which established Roosevelt State Park. In recognition of its vital role in "providing a convenient and economic means of transporting coal to Philadelphia, New York and the eastern seaboard," the Canal was designated a National Historic Landmark in 1976. United States Army Corps of Engineers, *Preliminary Case Report for Neshaminy Water Resources Authority, Point Pleasant Diversion Project, Point Pleasant, Bucks County, Pennsylvania* § 2.1 at 7 (1982).

This is at least as much evidence of an effect on interstate commerce as that found to satisfy this jurisdictional requirement in prior similar cases. *See Quivira Mining Co. v. United States E.P.A.*, 765 F.2d 126, 130 (10th Cir.1985) (non-navigable creeks and "arroyos" affect interstate commerce because during times of "intense rainfall" there could be a surface connection between these waterways and navigable streams), *cert. denied,* 474 U.S. 1055, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986); *United States v. Ashland Oil and Transportation Co.*, 504 F.2d 1317, 1329 (6th Cir.1974) (Act constitutionally applies to discharge of oil into non-navigable tributary three waterways removed from navigable river). In so holding, these courts recognized Congress' intent to give the term "navigable waters" the "broadest possible constitutional interpretation." *Ashland Oil,* 504 F.2d at 1324 (citing 118 Cong. Rec. 33756–57 (1972) (statement of Representative Dingell)); *Quivira Mining,* 765 F.2d at 129. The Pozsgais maintain these cases are distinguishable as both involved discharge into waterways rather than wetlands. But this is a distinction without a difference in light of the Corps'

regulation, which equates adjacent wetlands with waterways.

### B.

■ The Pozsgais also contend the regulation does not apply because the government failed to establish their discharge affected interstate commerce. The regulations require proof of an effect on interstate commerce, they argue, because their wetlands are "essentially isolated." In coining the term "essentially isolated," the Pozsgais seek to take this case outside *Riverside Bayview*, where the Supreme Court expressly reserved the question whether the Act authorized the Corps to regulate wetlands not "adjacent to open bodies of water." *Id.* 474 U.S. at 131 n. 8, 106 S.Ct. at 461 n. 8. They also use the term "essentially isolated" in an effort to bring their wetlands within the section of the regulation governing "isolated" wetlands. That section conditions application of the' permit requirement to "isolated" wetlands on a showing of a site-specific impact on interstate commerce. 33 C.F.R. § 328.3(a)(3).

The Pozsgais assert their wetlands are "essentially isolated" because they are "above the headwaters," the term "headwaters" being defined as "the point on a non-tidal stream above which the average annual flow is less than five cubic feet per second." 33 C.F.R. § 330.2(b). They note the regulation contains Nationwide Permit 26, which exempts the "discharge of dredged or fill materials" into wetlands above the headwaters from the individual permit requirement provided the discharger meets certain conditions. 33 C.F.R. § 330.5(a)(26). Establishment of this nationwide permit, the Pozsgais claim, reflects the Corps' policy judgment that these "essentially isolated" wetlands are the functional equivalent of isolated wetlands. Therefore, they conclude, an individualized showing of an interstate commerce effect is required to subject their "essentially isolated" wetlands to the Clean Water Act.[8]

The Corps' decision to establish a nationwide permit for discharge of fill material into wetlands above the headwaters apparently reflects the agency's expert judgment that these wetlands pose less of a water pollution concern than do certain other wetlands. *See* 33 C.F.R. § 320.1(a)(3) (justifying the nationwide permit program as "the primary method of eliminating unnecessary federal control over activities which do not justify individual control or which are adequately regulated by another agency"). But Nationwide Permit 26 hardly suggests wetlands above the headwaters are environmentally insignificant, as it conditions discharge on a water quality certification from the state in which the wetlands are located, 33 U.S.C. § 1341(a)(1) and 33 C.F.R. §§ 330.5(b)(11), 330.9(b)(3), and requires written notification to the Corps prior to discharge, 33 C.F.R. §§ 330.5(a)(26), 330.-7(b).

Moreover, the Pozsgais' contention that discharge into wetlands above the headwaters may only be regulated upon the showing of a specific effect on interstate commerce is foreclosed by § 328.3, in which the Corps distinguished for interstate commerce purposes between adjacent and isolated wetlands, and did not treat separately wetlands above the headwaters. Where, as here, the Pozsgais' wetlands are both above the headwaters and adjacent, only the latter characteristic matters for interstate commerce purposes. An explanatory statement issued by the Corps upon promulgation of the final regulation supports this conclusion: "[w]e emphasize that the "headwaters" concept used in this new regulation.... is not to be construed as the point beyond which a stream ceases to be a water of the United States....." 47 Fed.Reg. 37129 (1977).

8. The Pozsgais also rely on Nationwide Permit 26 as a separate defense to their unpermitted discharge, arguing the nationwide permit obviated the need for an individual permit. As did the district court, we reject this argument because the Pozsgais did not comply with the required procedures for the use of Nationwide Permit 26. Specifically, they failed to obtain a water quality certification from the State of Pennsylvania, as required by 33 U.S.C. § 1341(a)(1) and 33 C.F.R. §§ 330.5(b)(11), 330.9(b)(3), and failed to provide the Corps with pre-discharge notification for the use of Nationwide Permit 26 mandated by 33 C.F.R. §§ 330.5(a)(26), 330.7(b). The Pozsgais' failure to comply with the procedural requirements of Nationwide Permit 26 does not, however, foreclose them from arguing that regulation of their wetlands is permissible only upon the showing of an effect on interstate commerce.

The Pozsgais' claim that their wetlands are "essentially isolated" thus reduces to an attack on the "adjacency" regulation upheld in *Riverside Bayview.* But the use of the adjective "essentially" cannot convert the Pozsgais' "adjacent" wetland to an "isolated" wetland. This transparent effort to rewrite the regulation, like the Pozsgais' argument that the term "water" cannot mean "wetlands," is a policy question properly put to Congress or the Corps. *See Riverside Bayview,* 474 U.S. at 134, 106 S.Ct. at 463 ("[w]e cannot say that the Corps' conclusion that adjacent wetlands are inseparably bound up with the "waters" of the United States—based as it is on the Corps' and the EPA's technical expertise—is unreasonable"); *Chevron,* 467 U.S. at 866, 104 S.Ct. at 2793.

Accordingly, because the wetlands here qualify as "adjacent" within the meaning of the regulation, the government was not required to prove that "the use, degradation or destruction of [the Pozsgais' wetlands] could affect interstate commerce," 33 C.F.R. § 328.3(a)(3), in order to subject the Pozsgais to liability under the Clean Water Act.[9] Under the regulation, the requisite interstate commerce nexus was established because the wetlands were adjacent to a tributary of a waterway formerly used in interstate commerce. 33 C.F.R. § 328.3(a)(1), (7).

### V.

■ We now consider the Pozsgais' argument that the Corps' adjacent wetlands regulation as applied to them violates the Commerce Clause because the regulation does not require proof of a specific effect on interstate commerce from the Pozsgais' filling, and because wetlands above the headwaters, as a class of wetlands, do not significantly affect interstate commerce. We review challenges to Congress' exercise of its Commerce Clause power under a deferential standard. We will uphold application of the law if there is a "rational basis" for the

congressional determination that the regulated activity "affects interstate commerce," and if the means chosen to regulate the activity are reasonable. *Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 276, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981); *United States v. Frame,* 885 F.2d 1119, 1126 (3d Cir.1989), *cert. denied,* 493 U.S. 1094, 110 S.Ct. 1168, 107 L.Ed.2d 1070 (1990).[10]

In contending the Constitution requires an individualized effect on interstate commerce, the Pozsgais rely on cases construing other federal statutes—the Sherman Act, the Hobbs Act, the federal arson statute, and two federal labor statutes—which do require an individualized showing. But these cases demonstrate only that in those statutes, Congress chose to satisfy the Commerce Clause by requiring an individualized interstate commerce effect in each application of the law. The Clean Water Act, by contrast, handles the interstate commerce nexus differently. Under the Act, the Corps, acting under its statutorily delegated authority to establish the permit program, 33 U.S.C. § 1344, has determined that wetlands which are adjacent to tributaries of waters usable or formerly used in interstate commerce themselves affect interstate commerce. Several other Courts of Appeal have upheld this regulation against constitutional attack on the ground that congressional regulation of water pollution is permissible under the Commerce Clause, *United States v. Byrd,* 609 F.2d 1204, 1209 (7th Cir.1979), *United States v. Tull,* 769 F.2d at 185, *United States v. Ashland Oil,* 504 F.2d at 1325, and the Supreme Court has upheld this reasoning. *Hodel,* 452 U.S. at 282, 101 S.Ct. at 2363 ("we agree with the lower federal courts that have uniformly found the power conferred by the Commerce Clause broad enough to permit congressional regulation of activities causing air or water pollution").

The Pozsgais seek to distinguish these cases, contending the challenged activities in

---

**9.** As its text indicates, the regulation requires proof only that certain types of events could affect interstate commerce if they occurred in the particular isolated wetland, not, as the Pozsgais contend, proof that a particular discharge into that wetland could affect interstate commerce.

**10.** This test also applies where a party challenges a regulation promulgated by an agency acting under its statutorily delegated authority. *See United States v. Byrd,* 609 F.2d 1204, 1209 (7th Cir.1979) (upholding Corps' wetlands regulation against Commerce Clause challenge).

each of them involved "substantial effects" on interstate commerce, and arguing the government established no such effects here. But even assuming Congress' Commerce Power is circumscribed by a "substantiality" requirement, the Pozsgais misapply this standard. In contending their discharge activities did not have substantial effects on interstate commerce, the Pozsgais ignore the well-settled principle that "[w]here the class of activities is regulated and that class is within the reach of the federal [commerce] power, the courts have no power 'to excise, as trivial, individual instances' of the class." *Perez v. United States*, 402 U.S. 146, 154, 91 S.Ct. 1357, 1361, 28 L.Ed.2d 686 (1971) (quoting *Maryland v. Wirtz*, 392 U.S. 183, 193, 88 S.Ct. 2017, 2022, 20 L.Ed.2d 1020 (1968)).

The Pozsgais claim this so-called "cumulative effect" principle is inapplicable because wetlands above the headwaters, as a "class of activities," do not substantially affect interstate commerce. But the only evidence they offer in support of this argument is the Corps' decision to regulate these wetlands under Nationwide Permit 26. As discussed above, however, by the regulation's terms, this classification has no significance for interstate commerce purposes.

The Pozsgais also argue the cumulative effect principle has no application to wetlands generally. In announcing this principle to hold that federal production quotas could constitutionally be applied to a farmer who grew wheat for his own consumption in *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), the Supreme Court stressed that in the aggregate, home consumption of wheat competed with wheat grown for sale and therefore affected interstate commerce. The Pozsgais contend that discharge into wetlands cannot be similarly aggregated because their filling activities cannot be added to filling activities in California or Texas which involve other aquatic systems.

This reasoning is factually and legally flawed. In factual terms, it ignores that discharge by other property owners into wetlands above the headwaters within the same aquatic system as the Pozsgais clearly should be aggregated with the Pozsgais' discharge to determine the amount of pollution in that system. As a legal matter, we find no language in *Wickard* or its progeny requiring a showing of local or regional aggregation. Indeed, it would be illogical to impose such a requirement on the Corps of Engineers in the course of making national water pollution policy. The regulation reflects the Corps' expert determination that, in the aggregate, discharge into wetlands above the headwaters which are adjacent to tributaries of waters used or usable in interstate commerce, increases water pollution.[11] It matters not whether the increase is substantial in a particular region, or just in the nation as a whole. *Compare Perez v. United States*, 402 U.S. at 155, 91 S.Ct. at 1362 (finding *Wickard* applies to loan sharking, a $350 million per year national business, without discussing cumulation of particular transactions in regional or local credit markets). For these reasons, we hold that application of the Corps' wetlands regulation to the Pozsgais' discharge activities did not violate the Commerce Clause.[12]

---

**11.** The regulations reveal the Corps gave serious consideration to this issue. The interim final regulation issued on July 25, 1975, excluded waters and wetlands above the headwaters from the category of "waters of the United States" and therefore from the Act's coverage, except upon the District Engineer's specific determination that regulation of these waters "was necessary to protect water quality." 42 Fed.Reg. 37129. In the final regulations, issued two years later, in response to "comments and criticisms ... concerning ... the legality of excluding waters in rivers and streams above the headwaters from the definition of waters of the United States," the Corps decided to regulate waters and wetlands above the headwaters through the nationwide permit mechanism rather than by excluding them from the definition of covered waters. *Id.* We cannot say the Corps did not have a rational basis for this determination. *Cf. Riverside Bayview*, 474 U.S. at 134, 106 S.Ct. at 463 (Corps' determination that "waters of the United States" include adjacent wetlands was reasonable because it was based on Corps' and EPA's technical expertise).

**12.** In view of our disposition on the merits of the Pozsgais' appeal, we need not and do not reach the government's contention that John Pozsgai is collaterally estopped from raising these issues because they were resolved against him on his criminal conviction.

## VI.

We now turn to the Pozsgais' appeal from various orders entered by the district court during the course of this litigation. The Pozsgais contend the district court's contempt order was defective because, although labeled as "civil" contempt, the order was in fact "criminal" contempt. The two types of contempt differ in important respects. Civil contempt is remedial in nature, serving to coerce compliance with a court order or to compensate the other party for losses sustained due to noncompliance. By complying with the order, a civil contemnor can purge the contempt. Criminal contempt, by contrast, is a punitive sanction, designed to vindicate the court's authority for the contemnor's past non-compliance with a court order, and therefore cannot be cured by the contemnor. *Hicks on Behalf of Feiock v. Feiock,* 485 U.S. 624, 631–32, 108 S.Ct. 1423, 1429, 99 L.Ed.2d 721 (1988); 11 Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure* § 2960 at 583–85 (1973).

The purpose and nature of the sanction, rather than the label attached to it, determine whether it is civil or criminal. *Hicks,* 485 U.S. at 631, 108 S.Ct. at 1429. The two types of contempt also have different burdens of proof. Civil contempt must be proved by "clear and convincing" evidence, *Quinter v. Volkswagen of America,* 676 F.2d 969, 974 (3d Cir.1982), while criminal contempt must be proved beyond a reasonable doubt, *Hicks,* 485 U.S. at 632, 108 S.Ct. at 1429. To be valid, a criminal contempt proceeding must comport with Federal Rule of Criminal Procedure 42(b), which requires such proceedings to be "prosecuted on notice ... stat[ing] the time and place of hearing, allowing a reasonable time for the preparation of the defense, ... stat[ing] the essential facts constituting the criminal contempt, and describ[ing] it as such."

Here, the district court found Pozsgai in contempt for his past violations of the TRO against filling on the property, and ordered him to pay $5,000 within 48 hours or be put in jail. Although the order contains aspects of civil contempt, two significant features convince us it qualifies as criminal contempt. First, it was retroactive in nature, seeking to penalize previous violations. Second, it was punitive rather than remedial, because it did not compensate the government, but rather sought to vindicate the authority of the Court to enjoin Pozsgai from continuing his filling activities.

We believe the court afforded Pozsgai the protections necessary for a valid finding of criminal contempt. The Pozsgais contend the district court's failure to label the contempt as criminal in the hearing notice violated Rule 42(b), that this error was compounded by the government's request for "civil" contempt in its petition for an order to show cause, and that these errors render the proceeding invalid. We disagree. The government's petition for an order to show cause specifically enumerated past violations for which it sought contempt sanctions. Additionally, the government expressly requested not only that Pozsgai be incarcerated until he complied with the TRO, a civil contempt sanction, but also requested that he be incarcerated five days for each prior violation and fined $25,000 for each continued violation. Because the government sought a retroactive sanction, we believe its petition put Pozsgai on notice of the criminal nature of the contempt proceeding.

Additionally, we do not believe Pozsgai was prejudiced by the timing of the notice. The Supreme Court has held a district court's failure to label a contempt proceeding as criminal in the hearing notice is grounds for reversal only when the failure causes "substantial prejudice" to the defendant resulting from his lack of awareness that the proceeding is criminal. *United States v. United Mine Workers of America,* 330 U.S. 258, 297–98, 67 S.Ct. 677, 697–98, 91 L.Ed. 884 (1947). Pozsgai has not argued, nor presented any evidence, that "a more explicit motion ... would have aided him in the preparation of his defense." *United States v. Partin,* 524 F.2d 992, 999 (5th Cir.1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1493, 47 L.Ed.2d 753 (1976). His defense consisted entirely of testimony denying he had violated the TRO. The court chose not to believe him, expressly finding "beyond any doubt whatsoever" not only that Pozsgai knew of the post-TRO dumping but also that it occurred with his

approval. The videotape recording this activity provided overwhelming support for this conclusion.[13] Accordingly, we will affirm the district court's order of contempt.

■ The Pozsgais' final claims concern the district court's restoration order, which directed removal of fill material from the wetlands portion of the Pozsgais' property and redeposit of the material on the non-wetlands portion of the property. The Pozsgais object to the order on three grounds: (1) that it violates Fed.R.Civ.P. 65(d)'s standards for injunctive remedies because it fails to describe specifically the area of the property to be restored; (2) that the order itself was an abuse of discretion given the small degree of harm caused by the discharge and his financial inability to comply with it; and (3) that the court was wrong to deny the Pozsgais' Fed.R.Civ.P. 60(b) motion for relief from the restoration order seeking control over where on their property the restoration of the fill would take place.

With respect to the particularity of the restoration order, we note the injunction anticipated further negotiation between the Pozsgais and the government regarding the restoration plan, and that such negotiation has taken place, most recently in the parties' August 15, 1991 stipulation to a new map detailing the wetland areas to be restored.[14] We reject the Pozsgais' contention that the restoration order was inequitable because of the small degree of harm caused by their discharge and their financial inability to comply with the order. The undisputed facts demonstrating the Pozsgais' repeated noncompliance with the Act and with the Corps'

directives to stop filling foreclose any such equitable argument.

Finally, we consider the Pozsgais' motion for relief from judgment, in which they seek control to determine the location on the property where the material is redeposited. Denying the motion, the district court found it would be inequitable to give the Pozsgais such veto power—particularly now that the haulers have completed their work—because the Pozsgais caused the improper filling and refused to remedy the condition. We agree fully with this reasoning. Accordingly, we believe the district court did not abuse its discretion in fashioning the restoration order.

## VII.

For the foregoing reasons, we will affirm the judgment of the district court.

## ORDER

Aug. 10, 1993.

The Court treats appellants' counsel's letter of July 8, 1993, as a petition for panel rehearing and a motion to amend the opinion dated June 25, 1993.

The motion to amend is denied, and the petition for panel rehearing is denied.

---

13. We note the government's petition and the court's order to show cause provided Pozsgai with the essential facts underlying its request for contempt sanction. *United States v. Onu*, 730 F.2d 253, 257 (5th Cir.), *cert. denied*, 469 U.S. 856, 105 S.Ct. 182, 83 L.Ed.2d 116 (1984). The order to show cause gave Pozsgai notice of the time and place of the hearing, and the court scheduled a hearing a week after the order, which was a reasonable time to prepare a defense. *United Mine Workers*, 330 U.S. at 296, 67 S.Ct. at 697 (order to show cause can serve notice function of Rule 42(b)); *United States v. Powers*, 629 F.2d 619, 625 (9th Cir.1980) (five-day notice period allowed for hearings in Fed. R.Crim.P. 45(d) adequate preparation time for purposes of Rule 42(b)).

14. In the same vein, the Pozsgais appeal the temporary restraining order, arguing the court failed to "set forth reasons" as required by Fed. R.Civ.P. 65(d). The TRO states it was "upon consideration of the government's motion," and states that defendants "are immediately ordered to cease and desist from discharging fill material onto the site" and "ordered to cease and desist their further violation of the Clean Water Act, 33 U.S.C. § 1311(a)." We believe that under the circumstances of this case, the court's statement gave the Pozsgais adequate notice of the grounds for the TRO.