

Opinions of the United
States Court of Appeals
for the Third Circuit

1-30-2003

# John T. v. DE Cty Intermediate

Precedential or Non-Precedential: Precedential

Docket 01-3575

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"John T. v. DE Cty Intermediate" (2003). *2003 Decisions.* Paper 810.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/810

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed January 30, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-3575/4206

JOHN T., A MINOR BY HIS PARENTS AND NEXT
FRIENDS, PAUL T. AND JOAN T.; PAUL T.; JOAN T.,
INDIVIDUALLY, AND ON THEIR OWN BEHALF, ALL OF

v.

THE DELAWARE COUNTY INTERMEDIATE UNIT,

Defendant/Third-Party Plaintiff

v.

COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT
OF EDUCATION;

Third-Party Defendant

Delaware County Intermediate Unit,

Appellant No. 01-3575

JOHN T., A MINOR BY HIS PARENTS AND NEXT
FRIENDS, PAUL T. AND JOAN T.; PAUL T.; JOAN T.,
INDIVIDUALLY, AND ON THEIR OWN BEHALF, ALL OF

v.

THE DELAWARE COUNTY INTERMEDIATE UNIT,

Defendant/Third-Party Plaintiff

v.

COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT
OF EDUCATION;

Third-Party Defendant

John T., Paul T. and Joan T.

Appellants No. 01-4206

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 98-cv-05781)
District Judge: Honorable Norma L. Shapiro

Argued on June 13, 2002

Before: ROTH, RENDELL* and ROSENN,
Circuit Judges

(Opinion filed: January 30, 2003)

Dennis C. McAndrews, Esquire
 (Argued)
Monahan & McAndrews
Suite 108, 125 Strafford Avenue
Wayne, PA 19087

Howard G. Hopkirk
Office of Attorney General of
 Pennsylvania
15th Floor, Strawberry Square
Harrisburg, PA 17120

 Counsel for Appellants/Cross
 Appellees

_____

* The Honorable Marjorie O. Rendell participated in the oral argument
and conference and joined in the decision in this case on June 13, 2002,
but became recused from this matter prior to filing of the opinion. This
opinion and judgment are being entered insofar as the remaining judges
are unanimous in this decision.

2

Michael I. Levin, Esquire
 (Argued)
Allison C. Snyder, Esquire
Levin Legal Group, P.C.
1402 Masons Mill Business Park
1800 Byberry Road
Huntingdon Valley, PA 19006

 Counsel for Appellees/Cross
 Appellants

Caryl Andrea Oberman, Esquire
Robert T. Lear, Esquire (Argued)
Grove Summit Office Park
607A North Easton Road
Willow Grove, PA 19090

 Counsel for Amici Curiae

OPINION OF THE COURT

ROTH, Circuit Judge:

We review two Orders entered by the District Court for
the Eastern District of Pennsylvania in connection with a
claim brought under the Individuals with Disabilities
Education Act, 20 U.S.C. SS 1400 et seq.  (2002) (IDEA). For
the reasons set forth below, we will affirm both Orders.

First, the Delaware County Intermediate Unit (DCIU), the

defendant before the District Court, asks us to reverse a Contempt Order requiring it to pay plaintiffs John T. and his parents Paul T. and Joan T. (hereinafter "John T.") $1,100 in compensation for the costs of its failure to comply with a Preliminary Injunction. The DCIU raises various objections regarding the nature of the contempt proceeding, the requirements of the Preliminary Injunction and the process to which the DCIU was entitled. We conclude that none of these objections has merit.

Second, in a separate appeal, John T. asks us to reverse an Order that denied him attorney's fees. Before reaching settlement and voluntarily dismissing his claim, John T. had obtained preliminary injunctive relief and a civil

3

contempt order to enforce that relief. We must determine whether John T. then qualifies as a "prevailing party" under the IDEA fee-shifting provision. We hold that he does not.

I. Facts and Procedural History

John T. is a twelve year old mentally retarded child with Downs Syndrome. He lives with his family in the Haverford Township School District in Delaware County, Pennsylvania. From September 1993 until June 2000, John T. attended the St. Denis Elementary School, a non-profit, private school in Delaware County. Although John T.'s parents paid his St. Denis tuition, John T. received some publicly-funded special education programs and related services at St. Denis from the DCIU.

The DCIU is charged by Pennsylvania law with the provision of special education services to children with disabilities attending private schools within Delaware County. See 24 P.S. SS 9-972.1 & 13-1372(4) (2002) (charging the Intermediate Units with the provision of proper education, training and "auxiliary services" for exceptional children not enrolled in public schools) (collectively, the Pennsylvania Statutes).

During the summer of 1998, a dispute arose regarding the programs and services that DCIU was obligated to provide John T. for the 1998-99 school year. While the DCIU was willing to provide services to John T. at a public school, it refused to continue providing them at St. Denis. John T. and the DCIU were unable to resolve their dispute before the school year began. During the early months of that school year, the DCIU provided no programs or services to John T. and refused to provide the state due process hearing procedures outlined in the IDEA. During that time, John T.'s parents provided necessary programs and services to John T. at their own expense.

On November 2, 1998, John T. filed a Complaint in the United States District Court for the Eastern District of Pennsylvania. Proceeding under the IDEA, John T. sought inter alia (1) compensation for the cost of providing

programs and services during the first months of the 1998-99 school year, (2) provision of needed programs and

services for John T. at St. Denis during the remainder of the year, and (3) a due process hearing and other procedural safeguards provided by the IDEA.

After hearing testimony and argument, the District Court issued a Preliminary Injunction and Memorandum Opinion on May 8, 2000. See John T. v. Delaware County Intermediate Unit, 2000 U.S. Dist. LEXIS 6169 (E.D. Pa. May 8, 2000) (John T. I). The Preliminary Injunction ordered DCIU to "provide John T. with speech therapy, occupational therapy, a teacher's aide,[1] and an itinerant teacher,[2] for secular subjects only, at levels reasonably calculated to afford meaningful educational progress in his current school program at St. Denis." Id. at *31 (emphasis added).[3]

_____

1. "A teacher's aide is a one-on-one assistant working directly with the [disabled] child, full time, to help the child perform in a mainstream classroom. A teacher's aide minimizes the burden on the classroom teacher of caring for the special needs of a disabled child; for example, a teacher's aide takes the disabled child out of the classroom for breaks and keeps the disabled child's classroom materials in order." John T. I, 2000 U.S. Dist. LEXIS 6169 at n.3.

2. "An itinerant teacher, by consulting with a child's classroom teacher, aids the classroom teacher in modifying the regular education curriculum to teach the [disabled] child." John T. I, 2000 U.S. Dist. LEXIS 6169 at n.2.

3. The DCIU questions the District Court's interpretation of the IDEA with respect to this requirement. However, the DCIU waived the issue when it withdrew its direct appeal of the Preliminary Injunction. Accordingly, we will not resolve the issue here. A brief summary of the District Court's analysis is helpful nevertheless to understand the context of the District Court's rulings.

The IDEA, itself, does not mandate that local educational agencies like the DCIU provide special education and related services to disabled children who voluntarily attend private schools. See 20 U.S.C. S 1412(a)(10)(C) (2002). However, in analyzing John T.'s likelihood of success on the merits, the District Court concluded that the obligations imposed upon the DCIU by the Pennsylvania Statutes are incorporated into the IDEA. See John T. I, 2000 U.S. Dist. LEXIS 6169 at *14-*21. The District Court based this conclusion on a provision that states "[t]he term 'free appropriate public education' means special education and related services that . . . meet the standards of the State educational agency [(hereinafter SEA)]." 20 U.S.C.S 1401(8)(B). Because the IDEA

The District Court explained that the crux of the issue between the parties was not the extent of the services that the DCIU was obligated to provide to John T., but whether

the DCIU was obligated to provide services to John T. at St. Denis. See id. at *7. The court also set forth several findings of fact that supported its decision to keep John T. at St. Denis. Specifically, the court noted that previous attempts to move John T. to a public school had failed and that John T. benefitted from attending school at St. Denis because his two non-disabled siblings were students there. Ultimately, the District Court concluded that John T. "can only be educated effectively at St. Denis; he cannot receive an appropriate education at [the public elementary school]." Id. at *5.

On May 25, 2000, the DCIU appealed the Preliminary Injunction and filed a motion to stay the injunction with the District Court. The parties apparently agree that the DCIU took no action to comply with the Preliminary Injunction between May 8 and June 19, 2000. On June 19, the District Court entered a second Order denying the DCIU's motion to stay and compelling the DCIU to"comply with the preliminary injunction of May 8, 2000 FORTHWITH under penalty of sanctions for contempt of court." The DCIU withdrew its appeal of the Preliminary Injunction on November 27, 2000.

---

requires states, under certain circumstances, to provide disabled children with a "free appropriate public education," the District Court reasoned that the IDEA effectively incorporates any higher, SEA standards into this obligation. (Implicitly, the District Court also concluded that the Pennsylvania Statutes created such higher, SEA standards.)

Indeed, this Court, along with many other courts, has interpreted S 1401(8)(B) to incorporate heightened SEA requirements that are consistent with federal law. See, e.g., Michael C. ex rel. Stephen C. v. Radnor Twp. Sch. Dist., 202 F.3d 642, 652-53 (3d Cir. 2000) (noting that a more stringent state pendency requirement would be incorporated into the IDEA, but concluding that the SEA regulation at issue was not more stringent than the IDEA). See also Geis v. Board of Educ., 774 F.2d 575, 581 (3d Cir. 1985) (holding that an identical provision in the IDEA's predecessor statute -- the Education of the Handicapped Act (EHA) -- incorporated heightened SEA standards).

6

Over the remainder of the summer and the beginning months of the 2000-01 school year, the DCIU met with John T. and his parents and worked to develop an appropriate Individualized Education Program (IEP). During this process, the DCIU concluded that John T. needed a "life skills class" for 50% of his school day and that such a class could not be provided at St. Denis. For that reason, the DCIU issued a Notice of Recommended Assignment (NORA), proposing to move John T. to a public school within the Haverford Township School District.

John T.'s parents refused to approve the NORA. They argued that the NORA and IEP conflicted with the Preliminary Injunction's mandate that necessary programs

and services be provided at St. Denis. On October 23, 2000, the DCIU filed a motion with the District Court to either vacate or modify the Preliminary Injunction in order to allow the DCIU to provide necessary programs and services at a public school.

The parties dispute the extent to which the DCIU provided -- or even could have provided -- an itinerant teacher and a teacher's aide for John T. at St. Denis during September 2000. John T. argues that no such services were provided to him by the DCIU during that month and that his parents located teacher's aides at their own expense. The DCIU contends that it did provide some itinerant teacher services during September 2000 but that it had difficulty locating teacher's aides during that month because of a shortage of job applicants.

Dissatisfied with the proposed IEP and NORA, John T. sought and obtained a state administrative due process hearing. Pennsylvania Special Education Hearing Officer Linda Stengle presided over the hearing, which continued off and on from November 6, 2000, until January 4, 2001. On January 19, 2001, Hearing Officer Stengle released an order reaffirming the importance of John T.'s continued attendance at St. Denis and ordering the DCIU to modify John T.'s IEP accordingly. The DCIU appealed Hearing Officer Stengle's order to the Pennsylvania Special Education Due Process Appeals Review Panel, which reversed Hearing Officer Stengle's order on March 15, 2001.

7

Before the Review Panel had ruled, however, the District Court ordered the DCIU to Show Cause why it should not be held in contempt for failing to comply with the Preliminary Injunction. On September 4, 2001, after conducting a hearing, the District Court entered an order finding the DCIU in civil contempt of the Preliminary Injunction for failing to provide an itinerant teacher or teacher's aide during the month of September 2000. The Contempt Order required the DCIU to pay John T. $1,100 to compensate him for providing services during September 2000 at his own expense. On September 18, 2001, the DCIU appealed the Contempt Order.

Before the 2001-02 school year commenced, John T. and the DCIU were able to develop a mutually agreeable IEP pursuant to which John T. matriculated at a public school in the Haverford Township School District. Having thereby achieved the primary objective of his litigation before the District Court, i.e., obtaining a satisfactory IEP, John T. moved for voluntary dismissal of his Complaint pursuant to Federal Rule of Civil Procedure 41(a). John T. also moved for attorney's fees of $136,172.79, arguing that he was a "prevailing party" under the fee-shifting provision of the IDEA. See 20 U.S.C. S 1415(i)(3)(B).

By Memorandum and Order dated November 7, 2001, the District Court granted John T.'s motion for voluntary

dismissal but denied his request for attorney's fees. See John T. v. Delaware County Intermediate Unit, 2001 U.S. Dist. LEXIS 18254 (E.D. Pa. Nov. 7, 2001) (John T. II). John T. timely appealed the District Court's refusal to award attorney's fees.

## II. Jurisdiction and Standards of Review

The District Court had jurisdiction over the instant case pursuant to 20 U.S.C. S 1415(i)(3)(A) (conferring jurisdiction over IDEA actions specifically) and 28 U.S.C. S 1331 (federal question jurisdiction). We have jurisdiction over this appeal pursuant to 28 U.S.C. S 1291.

"The imposition of contempt is reviewed under an abuse of discretion standard and will only be disturbed if there is an error of law or a clearly erroneous finding of fact.

[citation omitted] We determine on a plenary basis whether the district court committed an error of law." Harris v. City of Philadelphia, 47 F.3d 1342, 1349 (3d Cir. 1995).

We typically review a decision to award or refuse attorney's fees under the IDEA's fee-shifting provision for an abuse of discretion. See Holmes ex rel. Holmes v. Millcreek Twp. Sch. Dist., 205 F.3d 583, 589 (3d Cir. 2000). However, where the legal standard applied by the district court is in question - as it is here - our review is plenary. See id.

## III. Discussion

### A. Contempt Order

The DCIU makes several challenges to the District Court's Contempt Order. First, the DCIU contends that, because it either complied with the Preliminary Injunction or at least made a good faith effort to comply, the Contempt Order was unwarranted. Second, the DCIU argues that the Preliminary Injunction was so vague and ambiguous that neither the DCIU nor the District Court could determine whether, as a matter of fact, the DCIU had complied with it. Third, the DCIU argues that the Contempt Order was criminal, not civil, so that the District Court erred by applying the wrong burden of proof in the contempt proceeding. Finally, the DCIU challenges the sufficiency of the notice for the contempt hearing. For the reasons stated below, we reject all of the DCIU's contentions and affirm the Contempt Order.

### 1. The District Court did not Err in Concluding that the DCIU Failed to Comply with the Preliminary Injunction.

"To prove civil contempt the court must find that (1) a valid court order existed, (2) the defendant had knowledge of the order, and (3) the defendant disobeyed the order."

Harris, 47 F.3d at 1326. The DCIU appeals the District Court's findings with respect to the third element, that the DCIU disobeyed the Preliminary Injunction. Because the District Court committed no clear error in making this finding of fact, we will affirm the Contempt Order.

9

The Harris elements must be proven by "clear and convincing" evidence, and ambiguities must be resolved in favor of the party charged with contempt. See Robin Woods, Inc. v. Woods, 28 F.3d 396, 399 (3d Cir. 1994); Harris, 47 F.3d at 1326. Notwithstanding this high evidentiary standard, the District Court's finding was sufficiently supported. For example, the District Court credited the testimony of John T.'s mother that the DCIU failed to provide a teacher's aide at all during September 2000. Moreover, Dr. Nancy Wybranski, the DCIU's own Assistant Director of the Special Programs Division, admitted that there were some days during September 2000 on which the DCIU did not provide a teacher's aide for John T.

The DCIU's related argument that the Contempt Order should be reversed because the DCIU made good faith efforts to comply with the Preliminary Injunction is also without merit. "Willfulness is not a necessary element of civil contempt," and, accordingly, "evidence .. . regarding . . . good faith does not bar the conclusion . . . that [the defendant] acted in contempt." Harley-Davidson, Inc. v. Morris, 19 F.3d 142, 148-49 (3d Cir. 1994).

2. The Preliminary Injunction is neither Vague nor Ambiguous.

The DCIU next argues that the Preliminary Injunction was vague and ambiguous in its instruction to "provide John T. with speech therapy, occupational therapy, a teacher's aide, and an itinerant teacher, for secular subjects only, at levels reasonably calculated to afford meaningful educational progress in his current school program at St. Denis." John T. I, 2000 U.S. Dist. LEXIS 6169 at *31 (emphasis added). The DCIU argues that this vagueness and ambiguity made compliance so difficult to assess that the District Court committed legal error by entering the Contempt Order. See, e.g., Ideal Toy Corp. v. Plawner Toy Mfg. Corp., 685 F.2d 78, 84 (3d Cir. 1982) (" "[T]he person enjoined must . . .'receive fair and precisely drawn notice of what the injunction actually prohibits.' ") (quoting Granny Goose Foods, Inc. v. Brotherhood of Teamsters, 415 U.S. 423, 444 (1974)).

The DCIU's argument is significantly undercut, however, by the fact that "levels reasonably calculated to afford

10

meaningful educational progress" is essentially the same standard by which any IEP is evaluated under the IDEA.

See Ridgewood Bd. of Educ. v. N.E. for M.E., 172 F.3d 238, 247 (3d Cir. 1999) (citing Board of Education v. Rowley, 458 U.S. 176, 192 (1982)). In other words, the DCIU's vagueness argument fundamentally attacks the courts' interpretations of the IDEA. Because the DCIU regularly develops and implements IDEA-compliant IEPs and the DCIU is, we assume, aware that any one of these IEPs may be subject to court review, we do not credit the DCIU's claim that it is confused by this description of the standard required for John T.

Reading the language of the Preliminary Injunction in light of relevant IDEA standards, the DCIU did have adequate notice of what the Preliminary Injunction required. See McComb v. Jacksonville Paper Co. , 336 U.S. 187, 191-92 (1949) (holding that an injunction not to violate a statute is not too vague to serve as basis for contempt order and enjoined party could have sought clarification of injunction). Although the terms of the Preliminary Injunction may be vague or ambiguous when considered in a vacuum, they are given content by the vast amount of administrative and judicial interpretation to which they are subject. See Geis v. Board of Educ., 774 F.2d 575, 582 (3d Cir. 1985).

3. The Contempt Order is Civil in Nature.

The DCIU also argues that the District Court erred by failing to provide it with procedural safeguards, including the "reasonable doubt standard of proof " applicable in criminal contempt proceedings. This argument assumes that the contempt proceedings against the DCIU were criminal in nature, notwithstanding the District Court's characterization of the proceedings as civil.

In advancing this argument, the DCIU relies on United States v. Pozsgai, 999 F.2d 719, 735 (3d Cir. 1993), for the proposition that "[t]he purpose and nature of the sanction, rather than the label attached to it, determine whether [a contempt order] is civil or criminal." Id.  The Pozsgai court held that a contempt order entered by a district court as a "civil" order was, in actuality, a "criminal" order which

11

could not be entered without applicable procedural safeguards. Essential to the Pozsgai court's determination, however, was its conclusion that the imposed sanctions bore two criminal characteristics. First, they were retroactive insofar as they sought to penalize previous violations. Second, they were punitive -- as opposed to remedial -- because they sought to vindicate the court's authority rather than to compensate an aggrieved party. Pozsgai, 999 F.2d at 735. Because the Pozsgai sanctions had these characteristics, the court determined that the contempt could not be purged.

The sanction imposed by the Contempt Order -- payment to John T. of $1,100 -- does not share the "criminal"

qualities identified in Pozsgai. While the sanction is retroactive, it is not punitive in nature. The sanction was intended to compensate John T. for the costs associated with the DCIU's failure to comply with the Preliminary Injunction, i.e., the costs of providing a teacher's aide for one month.

If civil contempt sanctions are not designed to punish, they may be retroactive. District courts hearing civil contempt proceedings are afforded broad discretion to fashion a sanction that will achieve full remedial relief. See McComb, 336 U.S. 187, 193-94. Often this discretion involves ordering payment for the costs of past non-compliance -- as, for example, in alimony contempt proceedings. See id. See also Pozsgai, 999 F.2d at 735 ("Civil contempt is remedial in nature, serving to coerce compliance with a court order or to compensate the other party for losses sustained due to noncompliance.") (emphasis added). Moreover, the DCIU could purge its contempt by paying John T. the $1,100 and complying with the mandates of the Preliminary Injunction.

The DCIU makes two arguments that the sanction was punitive, neither of which is persuasive. First, the DCIU argues that statements made by the District Court at the outset of the contempt hearing show an intent to punish. Specifically, the District Court stated that it was concerned with maintaining respect for the courts and coercing the DCIU's compliance. Respect for the courts and coercion of compliance, however, may be legitimate consequences of

12

any type of contempt proceeding. See Roe v. Operation Rescue, 919 F.2d 857, 868 (3d Cir. 1990). Even if the sanction had the tangential effect of increasing the DCIU's respect for the District Court and coercing it to comply with the Preliminary Injunction, the statement alone does not render the sanction punitive.

Second, the DCIU disputes the methodology by which the District Court arrived at the $1,100 sanction. The DCIU contends that if the calculation of the amount of the sanction was improper, it could not have been intended to compensate John T. Even if its methodology was not perfect, however, the District Court did articulate the relationship between the sanction and the actual damage suffered by John T. -- $1,100 is one-twelfth of the annual cost of providing a teacher's aide. Accordingly, the District Court's measure is consistent with its stated compensatory objective.

Because the sanction imposed by the Contempt Order is not punitive, Pozsgai is distinguishable. Accordingly, there is no reason to upset the District Court's characterization of the Contempt Order.

4. The Notice of the Contempt Hearing was
       Sufficient.

Finally, the DCIU contends that the District Court's order to Show Cause why the DCIU should not be found in contempt was not sufficiently particular. Specifically, the DCIU objects that the Show Cause Order neither identified whether the contempt proceeding would be civil or criminal in nature nor enumerated specific grounds for finding contempt. The Show Cause Order did, however, refer to both the Preliminary Injunction and Hearing Officer Stengle's report. Because Hearing Officer Stengle's report enumerated the specific instances in which the DCIU allegedly failed to comply with the Preliminary Injunction, we conclude that this notice was sufficient. Furthermore, the Show Cause Order indicates that the District Court conferred with both John T. and the DCIU on January 30, 2001, to discuss the implications of Hearing Officer Stengle's report. To the extent the DCIU was not clear about the grounds on which it might be found in contempt

13

or the nature of the contempt proceedings, it could have sought clarification at this conference.

In seeking more particular notice, the DCIU argues that it should have been provided the notice required for criminal contempt, giving reasonable time for preparation of the defense. See Rule 42(b) of the Federal Rules of Criminal Procedure. As explained above, however, the contempt proceedings before the District Court were civil, not criminal. Accordingly, the notice requirements of Rule 42(b) are inapposite.

B. Attorney's Fees

John T. argues that the District Court's refusal to award him attorney's fees was reversible error to the extent that it relied on Buckhannon Bd. & Care Home, Inc. v. West Virginia Dept. of Health & Human Resources, 532 U.S. 598 (2001). John T. maintains that Buckhannon should not preclude an award of attorney's fees pursuant to the fee-shifting provision of the IDEA for two reasons. First, he contends that Buckhannon does not apply to IDEA. Alternatively, and assuming arguendo that Buckhannon does apply, he argues that he is a "prevailing party" entitled to attorney's fees under Buckhannon. We conclude first that Buckhannon does apply to the IDEA fee-shifting provision and second that the District Court did not err in declining to award attorney's fees to John T.

1. Background.

We begin our analysis of John T.'s appeal with the "American Rule" that parties typically are responsible for their own attorney's fees. See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 247 (1975). Given this rule, we follow "a general practice of not awarding fees to a prevailing party absent explicit statutory authority." Key Tronic Corp. v. United States, 511 U.S. 809, 819 (1994). As

John T. and the District Court note, however, the fee-shifting provision of the IDEA does provide such explicit statutory authority. Section 1415(i)(3)(B) states,"In any action or proceeding brought under this section, the court, in its discretion, may award reasonable attorneys' fees as part of the costs to the parents of a child with a disability who is the prevailing party."

The Supreme Court has held that "plaintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." Hensley v. Eckerhart, 461 U.S. 424, 433 (1983) (quoting Nadeau v. Helgemoe, 581 F.2d 275, 278-279 (1st Cir. 1978)). Accordingly, "[t]he touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute." Texas State Teachers Ass'n v. Garland Independent School Dist., 489 U.S. 782, 792-93 (1989).4

More recently, the Supreme Court further clarified its understanding of the term "prevailing party." In Buckhannon, the Supreme Court held that a litigant whose FFHA and ADA actions were mooted by intervening state legislation was not a "prevailing party" for purposes of the FFHA and ADA fee-shifting provisions. See 532 U.S. at 600-01. Although the Buckhannon Court recognized that the plaintiff 's suit might have been a "catalyst" of the defendant's voluntary, legislative change, it held that the so-called "catalyst theory" was an insufficient basis on which to confer "prevailing party" status. See id. at 602. While the legislative change indisputably altered the legal relationship of the parties, it lacked an essential feature -- namely, a "judicial imprimatur." Id. at 605 (emphasis omitted).

The Buckhannon Court concluded that in order to be a "prevailing party," a party must be "successful" in the sense that it has been awarded some relief by a court . Id. at 603-604. This concept of "success," however, is not inconsistent with a defendant's concession or voluntary compliance. The Court acknowledged that a party benefitting from a settlement agreement, for example, could be a "prevailing party," provided the "change in the legal relationship of the

_____

4. Although Hensley and Texas State Teachers Ass'n interpreted the fee-shifting provision of 42 U.S.C. section 1988, Hensley noted that its standards were "generally applicable in all cases in which Congress has authorized an award of fees to a 'prevailing party.' " Hensley, 461 U.S. at 433, n.7.

parties" was in some way "judicially sanctioned." Id. at 605

(emphasis added). The Supreme Court then reconciled this rule with its previous holdings, noting that it had"only awarded attorney's fees where the plaintiff ha[d] received a judgment on the merits . . . or obtained a court-ordered consent decree." 532 U.S. at 605.

Finally, in J.O. v. Orange Twp. Bd. of Educ., 287 F.3d 267 (3d Cir. 2002), we considered whether an IDEA litigant who obtained a stay-put order5 was a "prevailing party" for purposes of the IDEA fee-shifting provision. Noting that stay-put orders "function[ ], in essence as an automatic preliminary injunction" to maintain the status quo during the pendency of proceedings, we focused on the interim nature of the relief. Id. at 272 (quoting Drinker v. Colonial Sch. Dist., 78 F.3d 859, 864 (3d Cir. 1996)) (alteration in original). Although we recognized the importance of the interim relief that the IDEA provides, we held that such relief could only form the basis of an attorney's fee award if it was in some way "merit-based." Id.  at 273-74. Because the interim relief obtained in J.O. did not involve a resolution on the merits of a claim, we held that J.O. was not a prevailing party. See id. Significantly, the J.O. decision was decided on this independent basis and without reference to Buckhannon.

2. Buckhannon Applies to the IDEA Fee-Shifting
       Provision.

We hold that Buckhannon applies to attorney's fee claims brought under the IDEA fee-shifting provision. In doing so, we follow the reasoning articulated by the Second Circuit in J.C. v. Regional School Dist. 10, Bd. of Educ., 278 F.3d 119 (2d Cir. 2002).

We agree with J.C. that Buckhannon heralded its wider applicability -- although it dealt only with the fee-shifting provisions of the FFHA and the ADA. Specifically,

_____

5. In relevant part, the stay-put provision of the IDEA provides that "during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of such child . . . ." 20 U.S.C. S 1415(j).

16

Buckhannon noted that Congress has used identical "prevailing party" language in numerous fee-shifting provisions, see 532 U.S. at 602-03 (expressly identifying the Civil Rights Act of 1964, the Voting Rights Act Amendments of 1975 and the Civil Rights Attorney's Fees Awards Act of 1976 as examples), and explained that the Supreme Court interprets these fee-shifting provisions consistently. See 532 U.S. at n.4 (citing Hensley, 461 U.S. at 433, n. 7 ("[The standards used to interpret the term "prevailing party" are] generally applicable in all cases in which Congress has authorized an award of fees to a 'prevailing party.' ") (emphasis added)).

The fee-shifting provision of the IDEA is no exception. The term "prevailing party" as it is used in Section 1415(i)(3) is not modified in any way. Moreover, as the J.C. court noted, the IDEA's legislative history shows that Congress intended that courts interpret the term"prevailing party" consistently with other fee-shifting statutes, including those expressly mentioned in Buckhannon. See 278 F.3d at 124. When the fee-shifting provision was added to the IDEA's predecessor statute, the Senate Labor and Human Resources Committee explained "it is the committee's intent that the terms 'prevailing party' and 'reasonable' be construed consistently with the U.S. Supreme Court's decision in [Hensley]." S. Rep. No. 99-112, at 13 (1986), reprinted in 1986 U.S.C.C.A.N. 1798, 1803 (footnote omitted).

John T.'s arguments to the contrary ask us to distinguish the IDEA fee-shifting provision from the fee shifting provisions at issue in Buckhannon. John T. argues that S1415(i)(3), unlike the fee-shifting provisions of the ADA and the FFHA, clarifies at great length the effect of "settlement offers" and "final resolution" on attorney's fee calculations. See, e.g., 20 U.S.C. S 1415(i)(3)(D)-(G). He argues that this clarification is consistent with the IDEA's policy of encouraging parents and school boards to pursue all types of amicable resolution -- whether or not judicially sanctioned. From this premise, he then concludes that Congress also intended to make attorney's fees available for all plaintiffs who achieve such amicable resolutions.

17

To the extent that John T. attempts to resurrect the "catalyst theory" as a basis of recovering attorney's fees, his argument is "simply not viable after Buckhannon, which considered and rejected various policy arguments in favor of the catalyst theory." J.C., 278 F.3d at 124. Additionally, as the J.C. court noted,

> it is difficult to reconcile [the] policy argument for awarding fees pursuant to informal settlements with the fact that, even before Buckhannon, Congress deliberately chose not to allow the recovery of attorneys' fees for participation in IEP proceedings that were not convened as a result of an administrative proceeding or judicial action. 20 U.S.C. S 1415(i)(3)(D)(ii). The IEP Team is a mechanism for compromise and cooperation rather than adversarial confrontation. This atmosphere would be jeopardized if we were to encourage the participation of counsel in the IEP process by awarding attorneys' fees for settlements achieved at that stage.

Id. at 124-25.

Moreover, the provisions that John T. cites for support do not relate to the "prevailing party" requirement. Rather, SS 1415(i)(3)(D) through (G) define situations in which

attorney's fees may be prohibited or reduced, e.g., when a parent has unjustifiably rejected a settlement offer or when a parent has unreasonably protracted the final resolution.

John T. contends that our reading of Section 1415(i)(3) will create a perverse incentive for parents to protract litigation with the hope of receiving some previously-incurred attorney's fees rather than settling with the certainty of receiving no attorney's fees. This argument "puts the cart before the horse" as it assumes that litigation decisions are driven by a desire to collect or to avoid paying attorney's fees -- and not by the litigants' interests. Even under fee-shifting regimes such as S 1415(i)(3) and the "generous formulation" that the Supreme Court gives the term "prevailing party," Hensley, 461 U.S. at 433, attorney's fee awards ultimately are awarded at a court's discretion. Because attorney's fees are never guaranteed, we question that litigation would be protracted for the sole purpose of winning an award.

18

Finally, to the extent that John T. invites us to interpret anew the term "prevailing party" in light of the IDEA policies, we decline to do so. Section 1415(i)(3) in no way alters the term's established meaning. The Buckhannon Court expressly warned that

> [g]iven the clear meaning of "prevailing party" in the fee-shifting statutes, we need not determine which way . . . various policy arguments cut. In Alyeska , . . . we said that Congress had not "extended any roving authority to the Judiciary to allow counsel fees as costs or otherwise whenever the courts might deem them warranted." To disregard the clear legislative language and the holdings of our prior cases on the basis of . . . policy arguments would be a similar assumption of a "roving authority."

532 U.S. at 610 (citations omitted).

3. The District Court did not err in Declining to
        Award John T. Attorney's Fees because John T. is
        not a Prevailing Party.

Having concluded that Buckhannon controls the interpretation of "prevailing party" as it is used in S 1415(i)(3)(B), we next consider whether John T. is, in fact, a prevailing party to whom attorney's fees may be awarded. Because we conclude that he is not, we will affirm the District Court's Order denying him attorney's fees. In doing so, however, we adopt a somewhat broader view of "prevailing party" than did the District Court which held that a prevailing party must have (1) received a judgment on the "merits" of the litigation, or (2) obtained a court-ordered consent decree. Our broader view is consistent with our holding in Truesdell v. Phila. Hous. Auth. , 290 F.3d 159 (3d Cir. 2002), where we held that a stipulated settlement could confer prevailing party status under certain

circumstances. See id. at 165 (finding stipulated settlement "judicially sanctioned" under Buckhannon where it (1) contained mandatory language, (2) was entitled "Order," (3) bore the signature of the District Court judge, not the parties' counsel, and (4) provided for judicial enforcement).

Under this interpretation, John T. is still not a prevailing party under Buckhannon and J.O. We begin our analysis by

19

focusing on John T.'s successes. Specifically, John T. obtained three forms of relief during the course of this litigation: the Preliminary Injunction, the Contempt Order, and the acceptable IEP that prompted him to seek a voluntary dismissal. As discussed below, none of these forms of relief will serve as the basis for conferring prevailing party status upon John T. We address each in turn.

        a. The Preliminary Injunction

The Preliminary Injunction is an insufficient basis on which to award attorney's fees to John T. because it is interim relief not based on the merits of John T.'s claims. Like the stay-put order at issue in J.O., the Preliminary Injunction was "designed to maintain the status quo during the course of proceedings." J.O., 287 F.3d at 272. Specifically, it required the DCIU to continue providing John T. with special education programs and related services at St. Denis.

Also like the stay-put order in J.O., the Preliminary Injunction was not merits-based. Although the District Court concluded that John T. "ha[d] shown a reasonable probability of success on the merits," it did not resolve any merit-based issue in John T.'s favor. John T. I , 2000 U.S. Dist. LEXIS 6169 at *9. In fact, all of John T.'s claims against the DCIU ultimately were dismissed with prejudice at his own request. See John T. II, 2001 U.S. Dist. LEXIS 18254 at *23.

Accordingly, J.O. controls, and John T. cannot be deemed a prevailing party based on the Preliminary Injunction alone. J.O. binds us independently, and Buckhannon does not require a different result. While J.O. presents IDEA claimants with a hurdle unidentified in Buckhannon, it is not inconsistent with Buckhannon. Before this Court, therefore, the requirements of both J.O. and Buckhannon govern claims brought under the IDEA fee-shifting provision.

        b. The Contempt Order

Similarly, the Contempt Order will not confer prevailing party status upon John T. This relief is, however, more

20

difficult to analyze within the framework of our existing precedent. While the Contempt Order certainly effected a "judicially sanctioned change in the legal relationship of the parties," Buckhannon, 532 U.S. at 605, it is difficult to ascertain whether it is "interim" or "merits-based" relief in the sense contemplated by J.O., 287 F.3d at 273.

On one hand, the District Court finally determined the DCIU's contempt by applying the "merits" of civil contempt -- that (1) a valid court order existed, (2) the DCIU knew of the order, and (3) the DCIU disobeyed the order. See Harris, 47 F.3d at 1326. Accordingly, the Contempt Order may be characterized as both non-"interim" and "merits-based" with respect to the law governing contempt orders generally.

On the other hand, John T. seeks attorney's fees pursuant to the IDEA fee-shifting provision -- and not, for example, as an additional sanction for the DCIU's civil contempt. From this perspective, it is decisive that the Contempt Order was merely a mechanism to enforce the Preliminary Injunction. With respect to the IDEA claims, therefore, the Contempt Order can be neither less"interim" nor more "merits-based" than the Preliminary Injunction, itself.

We conclude that we must consider the Contempt Order in its relation to the underlying relief that it enforces. In many respects, the scope of any civil contempt order is both defined and limited by the relief it enforces. For example, it is well settled that the viability of a civil contempt order entered either to remedy past non-compliance or to coerce future compliance with a preliminary injunction hinges on the validity of the underlying injunction. See United States v. United Mine Workers, 330 U.S. 258, 295 (1947) ("The right to [a civil contempt order's] remedial relief falls with an injunction which events prove was erroneously issued."); Latrobe Steel Co. v. United Steelworkers of America, 545 F.2d 1336, 1345-46 (3d Cir. 1976) (extending rule to coercive-- as opposed to remedial -- civil contempt orders). Additionally, under some circumstances, the appealability of a civil contempt order is contingent on the finality of the proceedings giving rise to the order. See, e.g. , 15B Charles

21

Alan Wright & Arthur R. Miller, Federal Practice and Procedure S 3917 (1992). We extend this general principle to conclude that a contempt order may not confer prevailing party status for purposes of the IDEA fee-shifting provision unless it enforces some IDEA relief that could, itself, confer prevailing party status. In any other situation, the party seeking the contempt order must seek relief for costs and fees as appropriate in the contempt proceeding -- as indeed the District Court indicated in denying the attorney's fee under IDEA: "Plaintiffs, should they successfully defend the contempt finding on appeal, may

resubmit a motion for fees on that issue alone . . .."

The Supreme Court's instruction to consider that"which
Congress sought to promote in the fee statute" underscores
the importance of focusing on the underlying IDEA relief.
Texas State Teachers Ass'n, 489 U.S. at 793. By enacting
the IDEA fee-shifting provision, Congress surely did not
seek to provide attorneys fees to any party who could prove
the "merits" of civil contempt independent of an IDEA
success. More likely, Congress sought to provide fees only
to those who prevailed with respect to an IDEA claim. When
the IDEA fee-shifting provision authorizes attorneys fees "in
any action or proceeding brought under this section," it not
only limits the universe to which it applies but also clarifies
the type of proceeding on which a party must"prevail." 20
U.S.C. S 1415(i)(3). Under J.O., the Preliminary Injunction is
an insufficient basis on which to deem John T. a prevailing
party. Accordingly, the Contempt Order that enforces it is
also insufficient.

      c. The Acceptable IEP

Finally, John T. is not a prevailing party by virtue of his
having obtained an acceptable IEP. Although John T.
undoubtedly realized an objective of his litigation upon
obtaining an acceptable IEP which placed him in the public
schools, this result was not "judicially sanctioned" as
required by Buckhannon. 532 U.S. at 605. John T. and the
DCIU developed the IEP through negotiations out of court,
and no court has endorsed the agreement with a "judicial
imprimatur." Id.

22

John T. argues to the contrary that we are not bound by
Buckhannon's requirement that settlements must be
"judicially sanctioned" in order to confer prevailing party
status. For this proposition, he cites Barrios v. California
Interscholastic Federation, 277 F.3d 1128 (9th Cir.) cert.
denied 123 S.Ct. 98 (2002).

In Barrios, the Ninth Circuit Court of Appeals dismissed
Buckhannon's conclusions regarding settlement agreements
as dictum. See 277 F.3d at n.5. In doing so, however, the
court distinguished Buckhannon on very narrow grounds. It
argued that Buckhannon applies only where litigation is a
catalyst for policy change, such as intervening legislation,
and not where litigation is a catalyst for mutually agreed
upon settlement. See id. (In fact, the Barrios court
discusses settlement as if it fell outside of the"catalyst
theory" framework altogether.) Instead, the Barrios court
relied on the Ninth Circuit's pre-Buckhannon rule that
settlements could confer prevailing party status with or
without judicial sanction. See id. at 1134 (citing Fischer v.
SJB-P.D. Inc., 214 F.3d 1115, 1118 (9th Cir. 2000)).

We will not follow Barrios's narrow reading of
Buckhannon. Although Buckhannon did warn against
relying on dictum, see 532 U.S. at n.5 (implying that the

"catalyst theory," itself, was spawned from Supreme Court dictum), it also cast a very broad net. By expressly linking its holding to other "prevailing party" fee-shifting statutes, the Buckhannon Court encourages an expansive reading. See id. at 602-03. Moreover, we read Buckhannon to reject the "catalyst theory" whole hog. While Barrios differentiates between policy changes and changes achieved through voluntary settlement, the Supreme Court's own understanding of the "catalyst theory" does not reflect such a distinction. See 532 U.S. at 601 ("[T]he 'catalyst theory' . . . posits that a plaintiff is a 'prevailing party' if it achieves the desired result because the lawsuit brought about a voluntary change in the defendant's conduct.").

IV. Conclusion

We will affirm the District Court's Contempt Order. The District Court's finding that the DCIU was in contempt is

23

sufficiently supported. The Preliminary Injunction was not overly vague or ambiguous. The DCIU was not entitled to the procedural safeguards applicable in criminal contempt proceedings. In addition, the Show Cause Order provided the DCIU with sufficient notice of the contempt hearing.

We will also affirm the District Court's denial of the petition for attorney's fees. Under J.O. and Buckhannon, which we apply expressly to the IDEA fee shifting provision, John T. is not a "prevailing party" by virtue of his having obtained the Preliminary Injunction, the Contempt Order or the acceptable IEP.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

24