

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-15-2005

# USA v. Lauderdale

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-1192

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"USA v. Lauderdale" (2005). *2005 Decisions.* Paper 842.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/842

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos.  04-1192 / 04-1348 / 04-1490 / 04-1704

UNITED STATES OF AMERICA

v.

HARRY E. LAUDERDALE,
Appellant (No. 04-1192)

SHERMAN HARRIS
Appellant (No. 04-1348)

JOHN LAGROSSA
Appellant (No. 04-1490)

DENNIS J. PIETRAK
Appellant (No. 04-1704)

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Criminal Action Nos. 02-cr-00042-14/7/12/18)
District Judge: Honorable William H. Yohn, Jr.

Argued June 9, 2005

Before: AMBRO, VAN ANTWERPEN and TASHIMA*, Circuit Judges

(Opinion filed: July 15, 2005)

* Honorable A. Wallace Tashima, Senior United States Circuit Judge for the Ninth
Circuit Court of Appeals, sitting by designation.

George Henry Newman, Esquire (Argued)
Newman & McGlaughlin
834 Chestnut Street, Suite 206
Philadelphia, PA 19107
        Counsel for Harry E. Lauderdale

Burton A. Rose, Esquire (Argued)
1731 Spring Garden Street
Philadelphia, PA   19130

Jeffrey M. Miller, Esquire
Nasuti & Miller
The Public Ledger Building, Suite 1064
150 S. Independence Mall West
6th and Chestnut Streets
Philadelphia, PA 19106
        Counsel for Sherman Harris

Robert E. Madden, Esquire (Argued)
1401 Walnut Street
Suite 300
Philadelphia, PA 19102

Eileen T. Lavin, Esquire
402 East Eagle Road
Havertown, PA 19083
        Counsel for John LaGrossa

Earl G. Kauffman, Esquire (Argued)
The Bourse - Suite 755
111 S. Independence Mall East
Philadelphia, PA  19106
        Counsel for Dennis J. Pietrak

Patrick L Meehan
   United States Attorney
Laurie Magid
   Deputy United States Attorney
   for Policy and Appeals
Robert A. Zauzmer
   Assistant United States Attorney

2

Senior Appellate Counsel
Joseph G. Poluka
Lesley B. Fitzgerald (Argued)
    Assistant United States Attorneys
Office of United States Attorney
615 Chestnut Street
Philadelphia, PA 19106
        Counsel for Appellee

---

OPINION

---

AMBRO, Circuit Judge

Harry Lauderdale, Sherman Harris, John LaGrossa, and Dennis Pietrak appeal their convictions and sentences. For the reasons that follow, we affirm the convictions (with the exception of one count against Harris, which the Government concedes is not sufficiently supported by the evidence). Additionally, in light of *United States v. Booker*, 543 U.S. ___, 125 S. Ct. 738 (2005), we remand for re-sentencing.

## I.    Factual Background and Procedural History

As we write only for the parties, we need not restate the facts in detail. On January 24, 2002, twenty individuals—including Lauderdale, Harris, LaGrossa, and Pietrak—were indicted by a federal grand jury and charged with violations of the Hobbs Act, 18 U.S.C. § 1951, and with theft and bribery concerning programs receiving federal funds in violation of 18 U.S.C. § 666. The indictments arose from fraudulent invoices submitted to the City of Philadelphia ("City") by a vendor, Electric Motors Corporation (trading as AAA Electric Motors Corporation ("AAA")). The Government charged that

3

the defendants, who were employed by the City, participated in an illegal scheme in which they signed and approved fraudulent invoices in exchange for kickbacks from AAA.

During the course of the scheme, AAA was a party to contracts with the City, pursuant to which it performed electric motor repairs to City-owned vehicles. AAA's owner, John Fafalios, frequently dealt with employees in various City departments who had authority to sign and approve repair invoices on behalf of the City. Lauderdale, Harris, LaGrossa, and Pietrak each worked for the City as supervisors—Lauderdale at Veterans Stadium for the Recreation Department, Harris and Pietrak at the Water Department, and LaGrossa at the Police Department.

At trial, the Government presented evidence showing that there was a general pattern concerning the scheme involving AAA. A telephone call would come to it (usually to AAA employee Anthony Camaratta[1]). Camaratta and the City employee would agree to meet at an appointed time at AAA. The City employee would arrive, sign false invoices—some entirely and some in part because they were inflated—with Camaratta, and then go into a closed-door meeting with Fafalios. There Fafalios made cash payments or gave merchandise to the City employee. In general, City employees were given kickbacks at a rate of one-third of the amount of the false invoices. Through this scheme, AAA overbilled the City in excess of $1 million. At trial, the Government

---

[1]Camaratta died prior to the indictment in this case and was named in it as an unindicted co-conspirator.

4

introduced hundreds of false invoices. Fafalios also testified that he made payments (or gave merchandise) to each of the defendants. Though Fafalios testified that the scheme continued until 1998, he was unable to recall specifically when he made payments to the defendants.

Lauderdale, Harris, LaGrossa, and Pietrak, respectively, were charged with violating the Hobbs Act. In addition, Harris was charged in two 18 U.S.C. § 666 counts, and LaGrossa and Pietrak were each charged in one § 666 count. After the District Court charged the jury, each of the defendants moved for a judgment of acquittal. (LaGrossa had previously moved for a judgment of acquittal at the close of the evidence against him.) The District Court deferred ruling until after briefing and oral argument. The jury returned a guilty verdict with respect to each defendant, and the District Court subsequently denied the motions for judgment of acquittal. Defendants appeal their convictions and sentences.[2]

## II.    Relevant Offenses and Sufficiency of the Evidence

The Hobbs Act defines extortion as, *inter alia*, "the obtaining of property from another, without his consent, induced by wrongful use of actual or threatened force, violence, or fear, or *under color of official right*." 18 U.S.C. § 1951(b)(2) (emphasis added). The Government is "merely required to prove that a public official obtained money to which he was not entitled and which he obtained only because of his official

_____

[2] The District Court had subject matter jurisdiction under 18 U.S.C. § 3231, as the defendants were charged with violations of federal criminal law. Our Court has appellate jurisdiction pursuant 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

position." *United States v. Janotti*, 673 F.2d 578, 595 (3d Cir. 1982) (*en banc*). 18

U.S.C. § 666 relates to theft or bribery concerning programs receiving federal funds,

including, *inter alia*, local governments (such as the City) that receive, in any one year

period, benefits in excess of $ 10,000 under a federal program. 18 U.S.C. § 666(b).

Under § 666, an agent of a local government who "embezzles, steals, obtains by fraud, or

otherwise without authority knowingly converts to the use of any person other than the

rightful owner[,] . . . property . . . valued at $5,000 or more . . .[that] is owned by, or is

under the care, custody, or control" of the local government, is guilty of theft. 18 U.S.C.

§ 666(a)(1)(A). The relevant statute of limitations for both offenses is five years, 18

U.S.C. § 3282(a), thus making the Government prove that crimes occurred on or after

January 24, 1997 (five years before the indictment).

> In reviewing a challenge to the sufficiency of the evidence,
>
> we apply a particularly deferential standard of review. The verdict must be sustained if there is substantial evidence to support it. It is not our role to weigh the evidence or to determine the credibility of the witnesses. We must view the evidence in the light most favorable to the Government and sustain the verdict if any rational juror could have found the elements of the crime beyond a reasonable doubt.

*United States v. Cartwright*, 359 F.3d 281, 285-86 (3d Cir. 2004) (internal quotation

marks and citations omitted). "The evidence need not unequivocally point to the

defendant's guilt as long as it permits the jury to find the defendant guilty beyond a

reasonable doubt." *United States v. Pungitore*, 910 F.2d 1084, 1129 (3d Cir. 1990). Thus

we "indulge all reasonable inferences in favor of sustaining the jury's verdicts." *United*

*States v. Pearlstein*, 576 F.2d 531, 534 (3d Cir. 1978).

We address in turn each defendant's arguments as to sufficiency of the evidence.

A.    Lauderdale

At trial, Fafalios testified that he paid Lauderdale for legitimate work, such as installing alarms at Fafalios's home.  Lauderdale argues that because some of these payments were legitimate, and because Fafalios could not identify which of the payments to Lauderdale were illegal payoffs and which were not, the Government's evidence was insufficient to support a conviction.

Lauderdale's argument, however, does not account for significant documentary evidence introduced by the Government, namely checks that Fafalios made out to himself (and gave to Lauderdale to cash) that included the notations "H" or "H/H"—abbreviations for "Harry" or Lauderdale's nickname, "Handsome Harry."  Of the ten checks the Government introduced against Lauderdale, five were dated after January 24, 1997.  In particular, Government Exhibit 349-3 is a check dated May 30, 1997 in the amount of $1,000 made out to Fafalios with the notation "H/H", and Government Exhibit 270 is a false invoice, also dated May 30, 1997, for approximately $3,000.  Similarly, Government Exhibits 284 and 285 are three invoices signed by Lauderdale on January 14, 1998, totaling approximately $3,000.  In turn, Government Exhibit 349-7 is a check made out to Fafalios with the notation "H" for $1,000.  Thus the dates on the invoices correspond with the date of the check.  Additionally, the $1,000 payoff is consistent with AAA's practice of a giving a one-third kickback to the City employee.  In light of this evidence, we reject

7

Lauderdale's argument.

B.    Harris

The documentary evidence clearly shows that Sherman Harris signed off on three fraudulent invoices after January 24, 1997. Nevertheless, Harris contends that the "dirty invoices" are insufficient to support the conviction because there was no evidence that he received a kickback for those particular invoices. In effect, Harris argues that there may have been an explanation (other than that he was receiving a kickback) for why he signed the false invoices. In light of the evidence linking Harris to AAA's scheme, including Fafalios's testimony, this argument in unpersuasive. Furthermore, although Fafalios did not remember specifically when he made a payment to Harris, from the dates on the false invoices the jury could infer that he committed offenses after January 24, 1997. Thus, the evidence presented against Harris is sufficient to support his Hobbs Act conviction and one count (Count 21) under § 666.[3]

C.    LaGrossa

LaGrossa makes two arguments concerning sufficiency of the evidence. First, he argues that no rational juror could have found that the payments he received were extortionate kickbacks because the money was given to him to help defray costs associated with his son's medical care. Second, he argues that no rational juror could

_____

[3]As to Harris's arguments under 18 U.S.C. § 666, the Government correctly concedes that it did not prove that the $5,000 threshold was met for the time period charged in Count 22. Therefore, his conviction under Count 22 cannot stand. The effect on Harris's sentence is better addressed on remand—which must occur in any event in light of *Booker*.

8

have found a Hobbs Act violation because the evidence did not show payment to City employees (as opposed to mere overbilling by AAA). Both arguments are unpersuasive.

The first argument is contradicted by Fafalios's testimony. Specifically, he testified that he gave LaGrossa money (though perhaps to be used in connection with Lauderdale's son's medical expenses) with the understanding that Lauderdale would "sign a false invoice." (Lauderdale App. 453a.) As we do not weigh the credibility of the witnesses at this stage of the proceedings, Fafalios's testimony is sufficient to rebut Lauderdale's argument.

Second, LaGrossa argues that AAA was involved in two distinct schemes. As to the first alleged scheme, he contends AAA submitted totally false invoices, and the City employee who signed them received a kickback. Under the second alleged scheme, AAA overbilled the City. For the latter scheme, LaGrossa asserts that AAA did not need a City employee's knowing involvement because the overbilling was not apparent on the face of the inflated invoice. LaGrossa also points out that Fafalios testified that he did not know whether kickbacks were given for inflated (as opposed to completely false) invoices. Contending that the Government failed to link him to a false invoice signed after January 24, 1997, LaGrossa takes the position that the Government has not proven a Hobbs Act violation.

We disagree. Though LaGrossa strenuously argues that Fafalios's testimony on this point significantly helps his case, viewed in context the testimony helps LaGrossa at most only minimally. That is, Fafalios's role in the scheme did not include preparing the

9

fraudulent invoices—that task was performed by Camaratta. For this reason, Fafalios's testimony is consistent with his role in the scheme and has little bearing on LaGrossa's arguments. Further, there is an absence of evidence in the record affirmatively suggesting that AAA distinguished between false and inflated invoices.

Supporting the Government's position is the testimony of Kevin Kelly, a Government witness and former City employee who testified that he received kickbacks from AAA for signing off on inflated invoices. Notwithstanding that Kelly's involvement with AAA ended several years before the limitations period, his testimony shows that AAA's schemes involving City employees included inflated invoices. In view of these considerations, sufficient evidence exists to counter this argument as well.[4]

D.    Pietrak

Pietrak argues that the fraudulent "invoices" he signed were actually delivery slips that were different from invoices signed by the defendants. Emphasizing this difference, he asserts that he was unaware he was signing false invoices because the delivery slips he signed did not contain part and pricing information, and therefore he did not know he was signing a fraudulent document. However, the testimony of Thomas Gallagher established (for purposes of our review of sufficiency) that the signature on a delivery slip—as much

_____

[4]LaGrossa's contention that the Government failed to prove that at least $5,000 was obtained by fraud during the 12-month period charged in the indictment, as required by 18 U.S.C. § 666(a)(1)(A)(i), is unpersuasive, as Government Exhibit 193a shows that the amount of the fraud exceeded $11,000 during the relevant 12-month period. Though LaGrossa argues that the Government did not establish that a violation occurred within the relevant period, Government Exhibit 193a also shows that LaGrossa approved a number of fraudulent invoices dated after January 24, 1997.

10

as signature on an invoice—is a representation that the City had received what they ordered.  Additionally, some delivery slips included part and pricing information.  Pietrak is re-hashing the argument he made to the jury and, given our standard of review, that argument must fail.  Thus we find the evidence sufficient for a reasonable jury to find Pietrak guilty.[5]

### III. Additional Challenges to the Convictions[6]

A.    Interstate Commerce

Lauderdale argues (for the first time on appeal) that the Government has failed to show the requisite effect on interstate commerce as required by the Hobbs Act. When the nexus to interstate commerce is not challenged in the District Court, we review the sufficiency of this evidence under a plain error standard.  *See, e.g., United States v. Zolicoffer*, 869 F.2d 771, 774 (3d Cir. 1989); Fed. R. Crim. P. 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.").

The Hobbs Act requires that commerce be affected "in any way or degree."  18 U.S.C. § 1951(a).  Even a *de minimis* connection is sufficient.  *See United States v.*

---

[5]Like other defendants, Pietrak points out that Fafalios did not clearly testify when he made payments to, for example, Pietrak.  In this regard, we agree with the District Court and the Government that the date stated on the invoices is sufficient to establish the timing of the offense.

[6]Defendants' briefs incorporate by reference certain arguments raised by other defendants.  For the sake of simplicity, we refer to these arguments as if they were raised only by the defendant that makes the argument in his brief.

11

*Cerilli*, 603 F.2d 415, 424 (3d Cir. 1979) (explaining that only a "reasonably probable effect on commerce, however minimal," is required).  However, under the Act, satisfying the effect on interstate commerce requires an individualized showing.  *See United States v. Pozsgai*, 999 F.2d 719, 733 (3d Cir. 1993).  That is, "Congress chose to satisfy the Commerce Clause by requiring an individualized interstate commerce effect in each application of the law."  *Id*.

At trial, evidence was presented indicating that AAA did business with out-of-state companies.  For example, it purchased ball bearings from an out-of-state company.  By expending money on illegal payments that otherwise would have gone to purchase goods in interstate commerce, there was a probable effect on interstate commerce.  *Cf. United States v. Janotti*, 673 F.2d 578, 592 (3d Cir. 1982) ("In substantive Hobbs Act convictions, the requisite nexus to interstate commerce has been found in the depletion of assets theory, because the payment of an extortion demand may reduce the assets available for the purchase of goods originating in other states.").  Given this low threshold, Lauderdale's argument fails.

B.      Motion to Sever

Lauderdale also contends that the District Court abused its discretion in denying his motion to sever the trial under Federal Rule of Criminal Procedure 14, which provides:

> If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or

12

provide any other relief that justice requires.

Fed. R. Crim. P. 14(a). Whether to sever a trial is left to the sound discretion of the District Court and will not be reversed absent "clear and manifest prejudice" resulting in an unfair trial. *United States v. Hart*, 273 F.3d 363, 370 (3d Cir. 2001).

Specifically, Lauderdale contends that the spill-over effect of the evidence against the other defendants led the jury to convict him. Following argument on the severance motion, the District Court ruled that severance was not warranted under Rule 14. It reasoned that "a jury can very easily distinguish among various employees and make a determination as to the guilt or innocence of each [one]. . . . [I]t will be rather easy for the jury to compartmentalize the facts as to . . . Lauderdale." Because the District Court reasonably balanced the competing interests, and in light of the speculative nature of Lauderdale's argument—essentially that the jury could not compartmentalize a set of facts—we fail to perceive that an abuse of discretion occurred in denying the severance motion.

C.     Jury Charge

Lauderdale attacks as well the trial court's use of the word "event" in a jury instruction on the statute of limitations. We review a jury instruction for abuse of discretion, "considering whether, in light of the evidence, the charge as a whole fairly and adequately submitted the issues in the case to the jury." *United States v. Zehrbach*, 47 F.3d 1252, 1264 (3d Cir. 1995) (en banc). "We must reverse if the instruction was

13

capable of confusing and thereby misleading the jury." *Id.*[7] Because we believe that the District Court fairly and adequately instructed the jury and that the instruction was not capable of misleading the jurors, we conclude that Lauderdale's argument fails.

In its initial charge to the jury, the District Court did not address the statute of limitations issue. Defense counsel then requested that the Court instruct the jury on this issue. The Court subsequently supplemented its instructions to the jury, telling them "you have to agree on at least one event before defendant—unanimously on one event before a defendant can be found guilty. And that event must be subsequent to January 24, 1997. You may consider the other things in your evaluation of whether they are guilty of that event. . . ." (Lauderdale App. 417a-18a.)

Lauderdale claims that the Court's use of the word "event" in the charge caused confusion. The charge proposed by Lauderdale's trial counsel, however, was itself problematic insofar as it defined "event" too narrowly. Moreover, we disagree that the District Court's charge was ambiguous or confusing. Though the Court later used "event" in its instructions without defining that term, it initially charged that the Government had to prove a "particular corrupt payment within the charged time frame." Viewing the instructions as a whole, the charge was neither misleading, ambiguous nor confusing. It thus was not in error.

---

[7]The parties disagree about whether Lauderdale (or the other defendants) waived his challenge to the statute of limitations charge by failing to make a specific, timely objection. Because the District Court concluded that this challenge was not waived and because there is not a precise standard for deciding whether the objection was timely, we assume non-waiver of the challenge and consider its merits.

D.      <u>Motion for New Trial</u>

Pietrak contends that the District Court erred by denying his motion for a new trial based on "newly-discovered" evidence. We review such a motion for abuse of discretion. *United States v. DiSalvo*, 34 F.3d 1204, 1215 (3d Cir. 1994). For a court to order a new trial on the basis of newly-discovered evidence, five requirements must be met:

> (a) the evidence must be in fact, newly discovered, *i.e.*, discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on[] must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

*Id.*; *see also United States v. Buss*, 461 F. Supp. 1016, 1020 (W.D. Pa. 1978) (denying new trial where evidence was neither "unknown nor unavailable" to the defendant prior to trial), *aff'd*, 601 F.2d 576 (3d Cir. 1979).

Pietrak's argument that there is in fact new evidence discovered since the trial is untenable. Though the documents at issue were located by Pietrak after the trial, those documents were, by Pietrak's own admission, available for his counsel's review prior to trial. Because the evidence was neither unknown nor unavailable, Pietrak cannot satisfy the first requirement, and we reject his claim that he was entitled to a new trial.

## IV.     Sentencing Challenges

Defendants argue that they received enhancements to their sentences based on facts not alleged in the indictment, proven to the jury beyond a reasonable doubt, or admitted by them in violation of their rights under the Sixth Amendment as interpreted by

15

the Supreme Court in *Booker*, 543 U.S. __, 125 S. Ct. 738. As we have concluded that sentencing issues arising in light of the *Booker* decision are best determined by the District Court in the first instance, we vacate the sentence and remand for re-sentencing.

## V. Conclusion

For the above reasons, we reverse the judgment of conviction as to Count 22 (against Sherman Harris). We affirm the remaining convictions, but remand for re-sentencing in light of *Booker*.